**PULLER MORTGAGE ASSOCIATES, INC. and Kenneth A. Puller, Plaintiffs,**

v.

**Larry A. KEEGAN, Defendant.**

**No. IP 90–239 C.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 30, 1993.

Richard S. Ewing, Stewart & Irwin, Indianapolis, IN, for plaintiffs.

Larry A. Keegan, Indianapolis, IN, for defendant.

## ENTRY

BARKER, District Judge.

The plaintiffs in this case filed a fifteen count complaint against twenty-three defendants, in which they allege various forms of fraud, breach of contract, deception, and racketeering. Two years later, only one

*pro se* defendant,[1] Larry A. Keegan, and the five counts against him remained.[2] This court conducted a bench trial on those five counts,[3] and now enters the following Findings of Fact and Conclusions of Law:

## I. Findings of Fact

1. Puller Mortgage Associates, Inc. (hereinafter referred to as PMA), is an Indiana mortgage banking company. PMA maintains its principal corporate residence in Marion County, Indiana.

2. Kenneth A. Puller is the president of PMA and jointly owns (with his spouse, Reva R. Puller) 100% of PMA's outstanding stock. Kenneth A. Puller maintains his personal residence in Hamilton County, Indiana.

3. PMA was formed in 1976 for the purpose of providing mortgage banking services for the federally insured housing industry.

4. Between 1982 and 1989, PMA became the first private mortgage banking company in the United States to receive HUD licenses to coinsure loans for the substantial rehabilitation of multi-family housing, the new construction of multi-family dwellings, and the new construction and substantial rehabilitation of nursing homes.

5. Throughout the 1980s, PMA used its HUD licenses to access secondary capital markets by pooling and securing mortgages under the authority of the Government National Mortgage Association (hereinafter referred to as GNMA), an agency of HUD. As a GNMA mortgage backed seller/servicer/issuer, PMA was able to fund HUD coinsured mortgages through the issuance and sale of GNMA mortgage backed securities. In order to fund loans and construction draws at a closing, PMA borrowed from a "warehouse" credit line, which it subsequently repaid by selling GNMA securities backed by a project's mortgage.

6. As a HUD mortgagee, HUD coinsuring lender, and GNMA seller/servicer/issuer, PMA was required to maintain a minimum level of net worth, liquidity, and sound capital resources.

7. PMA realized substantial profits throughout most of the 1980s, but in 1988, PMA began suffering financially, and on March 15, 1989 disaster struck PMA: A jury

---

1. In fact, Keegan had the benefit and advice of several different attorneys throughout the time period and events which lead up to this litigation, but, unfortunately, dismissed their help and proceeded to conduct these complex and international business transactions without the assistance and guidance of retained counsel.

2. The plaintiffs proceeded against defendant Keegan only on Counts X, XII, XIII, XIV, and XV.

3. After Keegan filed his post-trial brief/closing argument, he filed a *Motion for Amending the Counterclaim and Joinder of Parties* (although Keegan had no active counterclaim to amend). In that motion, Keegan claims that in the course of deposing the plaintiffs' witnesses, he discovered that the plaintiffs and their associates had concealed information about "plots against Keegan's character and hence the plots to gain control of the Board of Directors of PMA, away from ACI...." Keegan also claims in that motion that, "Overwhelming evidence [of fraud and conspiracy] has been admitted, that demands, [sic] for an Amended Counter Claim by the Defendant, Larry A. Keegan [against the plaintiffs]." Keegan concludes:

 The law and Justice demands that the Defendant be allowed to file and have the Court accept the Amended Counter Claim as part of this action and *pray that the Court will deliberate and judge the Counts and allegations in the Amended Counter Claim as though the Amended Counter Claim were filed originally.*

 In Keegan's 351 paragraph, 116 page counterclaim, he asserts that the plaintiffs, Reva Puller, Timothy A. Brazill, Douglass R. Brown, and the law firm of Brazill and Bennett are liable under the theories of breach of contract, breach of duty of good faith, fraud (negligent misrepresentation, fraudulent misrepresentation, and fraud on a financial institution), securities fraud, deception, Racketeer Influenced and Corrupt Organizations/Corrupt Business Influence, Tortious Interference With Contractual and Business Relationships, Theft and Conversion, and Licensing Fraud; essentially (and perhaps thoughtlessly) mirroring the plaintiffs' complaint. Keegan did not move to file an amended counterclaim before or during trial, yet he now seeks to assert claims against the plaintiffs and other non-parties. Keegan's motion is untimely and his claims "arise[] out of the transactions or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." The court does not find that Keegan failed to set up this counterclaim through oversight, inadvertence, or excusable neglect, or that justice requires allowing Keegan to file its amended counterclaim. Fed.R.Civ.P. 13(a) and (f). Keegan's motion to file an amended counterclaim and join third parties is denied.

in Colorado returned a verdict against PMA for approximately $4,850,000 (hereinafter referred to as the "Colorado Judgment").

8. PMA subsequently informed HUD that because of its financial problems and the Colorado Judgment, PMA's financial statement no longer met the required minimum levels of net worth, liquidity, and sound capital resources necessary to retain its coinsurance licenses.[4]

9. On April 25, 1989, the FHA and HUD suspended PMA's coinsurance licenses. In the HUD withdrawal notice, HUD notified PMA that its coinsurance licenses would be reinstated if, within ninety days, PMA was able to file a financial statement demonstrating that PMA met HUD's required minimum levels of net worth, liquidity, and sound capital resources.

10. Due to the insecurities surrounding PMA's regulatory status, PMA's warehouse lenders refused to fund further construction draws to PMA' borrowers, and on May 10, 1989, GNMA cancelled PMA's GNMA issuing authority. Nine days later, GNMA took possession of PMA's coinsurance portfolio.

11. Prior to the entry of the Colorado Judgment, PMA and the New York Life Insurance Company were working to put together a $250,000,000 public securities offering (hereinafter referred to as the "NYLife Offering"). PMA was to be a principal in that offering—PMA was to originate, process, and service loans funded through the NYLife Offering—but because of the Colorado Judgment and PMA's regulatory problems, the offering was put "on hold." The NYLife Offering was projected to bring PMA a profit of $4,500,000 over a period of two years.

12. Enter Larry A. Keegan. Keegan, a resident of Sacramento County, California, is the president and the Chief Executive Officer of American Capital Investments (hereinafter referred to as ACI), a California corporation.

13. Keegan, whose companies were experiencing financial problems of their own, wanted to acquire a HUD coinsurance license for ACI. When he learned of PMA's financial and regulatory difficulties, Keegan re-quested a meeting with Ken Puller and PMA. On May 18, 1989, a tele-conference call was arranged, during which Keegan told Ken Puller, Timothy P. Brazill (a PMA attorney), and Douglas Brown (PMA's general counsel) that he retained control over fifty-nine million dollars worth of real estate, which could be converted into approximately seventeen million dollars cash. Keegan explained that his company, ACI, was a holding company, and spoke of "mushrooms of equity" (whatever that is) based on ACI's corporate and real estate holdings. Keegan told Puller that he was ready and able to resolve PMA's regulatory and financial problems, but PMA would have to act quickly, because if PMA did not accept his help, "he had to do something else with these particular real estate holdings."

14. When Puller and his associates apprised Keegan that PMA would need an immediate cash infusion of no less that $1,500,000, Keegan responded, "I can do that."

15. In the following days, Puller, Brown, and Brazill traveled to Washington, D.C. to speak with HUD officials about PMA's financial and regulatory problems. Keegan, too, traveled to Washington, D.C., and on May 21, 1989, the day before PMA was to meet with the HUD officials, Keegan, for the first time, met face to face with Puller, Brown, and Brazill. In Puller's Washington hotel room, Keegan provided to Puller a document entitled "Preliminary Business Outline & Concepts" (Exhibit 10a), and for approximately three hours discussed his and ACI's business abilities. During that meeting, Keegan made the following representations:

(1) Larry Keegan is the president, chief executive officer, promotor, and substantial shareholder of ACI;

(2) Larry Keegan has a significant understanding of the FHA mortgage business, and currently owns and operates several very successful mortgage companies in California, including the Statewide Mortgage Amaford Corporation;

(3) ACI is a holding company, the assets of which consist of various parcels of real estate located throughout the United States;

---

**4.** The Colorado Judgment was informally settled for approximately $500,000 on April 11, 1993.

(4) ACI is affiliated with and/or owns, as subsidiaries, Statewide, the Amaford Group, and the American Affordable Life Insurance Company;

(5) Statewide and Amaford are profitable, private mortgage banking companies, and the American Affordable Life Insurance Company is an extremely profitable life and casualty insurance company that maintains a general agency relationship with Life USA of Minneapolis, Minnesota and approximately 400 insurance agents throughout California;

(6) ACI has the ability to use approximately $57,700,000 in real estate assets that can be immediately converted into at least $17,000,000 in cash;[5] and

(7) ACI holds control over that real estate, pursuant to the terms of stock subscription agreements executed by and between ACI and its "subscribers";[6]

16. At the close of that meeting, Keegan, in exchange for a majority ownership interest in PMA, offered to provide PMA sufficient and acceptable short-term operating cash and permanent equity capital such that HUD, FHA, and GNMA would reinstate PMA's suspended mortgage licenses. Keegan also proposed that if Puller would agree to remain as president of PMA for five years or more, ACI would agree to pay Puller an annual salary of $350,000 plus 20% of PMA's net profits.

17. On May 22, 1989, the day after the Washington hotel-room meeting, Keegan provided PMA additional documentation in support of his offer, to wit:

(1) A set of documents describing various real estate "controlled" by ACI (Exhibit 8);

(2) Copies of subscription agreements between ACI and ACI subscribers (Exhibit 9); and

(3) A binder containing a description of "ACI Land Acquisitions." *See* Plaintiffs' Post-Trial Brief, p. 9.

18. Later that same day, PMA officials met with the HUD officials. After reviewing PMA's financial status, the HUD officials told PMA that before they would restore PMA's revoked privileges as a GNMA issuer and FHA coinsurance lender, and approved FHA mortgagee, PMA would have to present a reinstatement proposal to HUD providing for the following:

(1) An equity infusion sufficient to allow PMA to submit an audited financial statement confirming that it had reestablished the necessary net worth, liquidity, and sound capital resources levels;

(2) The repayment of GNMA advances; and

(3) The acquisition of a warehouse credit line to assure the timely funding of PMA's future construction and permanent loans.

19. The HUD officials believed that for PMA to regain its coinsurance licenses, PMA would need to acquire $1,500,000 in cash (to disburse certain liabilities) and $10,000,000 in net equity (to improve the asset side of its balance sheet.)[7] These requirements were not federally imposed mandates, but, according to Brazill's characterizations, represented "an organic dialogue of federal officials who were very well acquainted with Mr. Puller." HUD, GNMA, and FHA officials invited Puller to return to Washington on June 5, 1989 to submit a formal reinstatement proposal.

---

**5.** Keegan told PMA that he was affiliated with Jim Westlake, who had a current net worth of at least $30,000,000, Bob Guiltinan, the president of Statewide Mortgage, and George Sallas, president of Four Seasons Financial; and that if he, ACI, and PMA reached an agreement, those "sources" would be able to immediately infuse at least $1,500,000 worth of operating capital into PMA and "resolve [PMA's] ten million dollar equity infusion" problem.

**6.** The plaintiffs entered into evidence Exhibit 8a, a handwritten document Keegan prepared for PMA during the hotel room meeting. That hand-

written document is simply a list of names/property with corresponding numbers. Exhibit 8a, standing alone, does not evidence ownership and/or control over real estate.

**7.** PMA needed an equity infusion and a "credit enhancement." PMA could not just borrow money; it was required to put new capital on the asset side of its balance sheets without absorbing a corresponding liability to meet HUD's required minimum *levels* of net worth, liquidity, and sound capital resources.

20. On May 26, 1989, Keegan sent (by facsimile) to PMA a cover letter [8] and a draft document entitled "Preliminary Agreement/Letter of Intent." The Preliminary Agreement/Letter of Intent provided for an exchange of PMA stock for ACI stock and for ACI to "transfer to PMA Real Estate in sufficient quantities to satisfy the regulators for cash and assets."

21. PMA and Keegan discussed the terms and conditions of Keegan's proposal over approximately a two week period, and on June 5, 1989, PMA and Keegan reached an agreement in principal to move forward with Keegan's proposal.

22. Later that day, on June 5, 1989, Puller, Brazill, and Brown traveled to Washington to present PMA's proposal for reinstatement to HUD, GNMA, and FHA officials. The reinstatement proposal included a copy of the unexecuted Preliminary Agreement/Letter of Intent and an explanation of the PMA/ACI tentative business arrangement. Upon reviewing that proposal, the HUD, FHA, and GNMA representatives assured Puller that if the contemplated recapitalization were accomplished and warehouse lines of credit were established as outlined in the reinstatement proposal, PMA would be fully reinstated as a government approved coinsurance lender.

23. After the June 5th meeting with the HUD, FHA, and GNMA representatives, Keegan, Brazill, and Brown, acting on behalf of PMA,[9] sat down to negotiate the final terms of the Preliminary Agreement/Letter of Intent, and in the early hours of June 6, 1989, Keegan, ACI, Puller (*see* footnote 9), PMA, Brown, and Brazil formally executed the Preliminary Agreement/Letter of Intent. In summary, the Preliminary Agreement/Letter of Intent provided for:

(1) Puller to transfer controlling interest in PMA (a majority interest of PMA stock) to ACI in exchange for two million shares of ACI common stock (with a stated value of $5.00 a share, for a total value of ten million dollars);

(2) Puller to serve on PMA's and ACI's board of directors for at least five years (Keegan was to serve as vice president/executive committee member of ACI);

(3) Puller to be paid an annual base salary of $350,000 plus an "annual override of 20%" of the net profits of PMA; and

(4) ACI to "transfer, deliver, and convey to PMA good and merchantable title to cash, goods funds, net equity in real estate, and other assets acceptable to PMA" in the form of either $10,000,000 in cash and/or equity or the amount necessary to meet the HUD, FHA, and GNMA minimum levels of net worth, liquidity, and sound capital resources, whichever is greater. The agreement provided that Ken and Reva Puller, as an "additional incentive" to enter into the agreement, would receive $3,000,000 in cash from ACI and PMA.

By its own terms, the closing date of the contract was to be on or before June 15, 1989.[10]

24. The Preliminary Agreement/Letter of Intent was conditioned upon PMA's receiving adequate assurances that if PMA were funded and reorganized as contemplated in its reinstatement proposal, HUD, FHA, and GNMA would fully reinstate PMA as an approved government lender and upon PMA's settling the Colorado Judgment for $500,000; if the Colorado Judgment was not settled for $500,000 or less, the Preliminary Agreement/Letter of Intent provided that ACI could, at its discretion, "readjust" the terms of the "stock price given to [Puller]." The

---

**8.** The cover letter, perhaps foreshadowing events to come, stated that the attached agreement is:

of course contingent upon our being able to salvage the approvals, our being able to provide the necessary assets, your due diligence concerning our abilities to provide the assets and our understanding and acceptance of the additional risks.

**9.** As the negotiations progressed into the evening, Puller signed the signature page of the Preliminary Agreement/Letter of Intent and gave Brown the power of attorney to negotiate and execute the final language of the remainder of that agreement on his behalf.

**10.** The agreement was subsequently amended on July 18, 1989 to extend the closing date to August 15, 1989.

Preliminary Agreement/Letter of Intent was also conditioned on:

(c) The due diligence investigation, of ACI, in the good faith opinion of PMA, is favorable, which must be complete and notification made to ACI, by June 15, 1989, in writing of any discrepancies, or the investigation is deemed to be acceptable to PMA[; and]

(d) The due diligence investigation, of PMA, in the good faith opinion of ACI, is favorable, which must be complete and notification made to PMA, by June 15, 1989 in writing of any discrepancies, or the investigation is deemed to be acceptable to ACI.

25. In the meantime, PMA had been negotiating with several investment firms, including Smith, Barney, Harris, Upham & Company (hereinafter referred to as Smith Barney), about setting up a warehouse credit line and an "interim mezzanine" loan. Smith Barney told PMA that it would "anxiously consider" giving PMA an equity infusion, but it was concerned about Keegan's and ACI's ability to perform its obligations under the Preliminary Agreement/Letter of Intent and to provide the necessary documentation/assets to set up an acceptable credit facility.

26. As part of PMA's "due diligence" inquiry, to begin setting up the credit facility, and to allay Smith Barney's concerns about ACI's ability to perform its obligations under the Preliminary Agreement/Letter of Intent, Brazill requested a "significant amount of documentation" from ACI, that is, documentation verifying ACI's ownership of and/or control over real estate assets, corporate and financial information on ACI's companies, and personal background information on Keegan and the other ACI officers.

27. What Keegan provided Brazill in response to his requests, however, was a compendium of title searches, typed descriptions of land holdings with corresponding liabilities, and a few Quit Claim deeds. It was a document package, according to Brazil, "woefully insufficient to serve as verification of ownership ... [and evidenced] simply some form of preliminary agreement between ACI and several persons referred to as being ACI subscribers."

28. Uncomfortable about dealing with Keegan and ACI, Robert Holloman of Smith Barney personally asked Keegan for some background information and documentation that could verify Keegan's ability to perform his obligations under the Preliminary Agreement/Letter of Intent. In response, Keegan told Holloman that he associated with, among others, Saint Elmo "Speedy" Felkel, Paul Hartell, Garth Grisson, Joan Igo, and Robert Gastineau. Of that group, Holloman had heard of Paul Hartell, whom Holloman knew to be a person of significant means but troubled by the savings and loans crisis. Holloman and Brazill requested more information about ACI's holdings, but in the end, all Keegan ever provided Holloman and Brazill was the package of documents introduced as Exhibit 8.

29. Brazill eventually telephoned Robert Gastineau, one of the subscribers/Keegan associates, who confirmed that he and the other ACI subscribers were involved with Keegan and ACI and that the referenced real estate was available to ACI for the purpose of refinancing PMA.

30. On August 1, 1989, Holloman telephoned Brazill to say that he had conferred with HUD officials and concluded that HUD would find the Smith Barney/PMA/ACI deal acceptable. Holloman, however, still had a "fundamental disbelief" as to Keegan's credibility and ACI's ability to put the claimed real estate into an acceptable credit facility.

31. Brazill conveyed Holloman's concerns to Keegan, and at Keegan's insistence, Keegan and Brazill almost immediately flew to New York to meet with Holloman. One day later, on August 2, 1989, Keegan delivered to Holloman the same business plan speech he had given to PMA representatives on May 21, 1989. When Keegan had finished, Holloman told Keegan that Smith Barney would go forward with the transaction and provide PMA short term and warehouse financing if Keegan and ACI could produce the usual and customary evidence of title (title work, deeds, abstracts, title insurance commitment, and so

forth [11]) of the ACI real estate and put that real estate into an acceptable, usual, and customary credit facility.[12]

32. Keegan and Brazill flew back to Indianapolis from New York, and on August 3, 1989, apparently buoyed by Holloman's reaffirmation of its willingness to provide warehouse financing, Keegan, Puller, Brazill and Brown amended the terms of the Preliminary Agreement/Letter of Intent. Under this Second Amendment, on August 4, 1989, Puller was to transfer and convey to ACI 75% of outstanding PMA stock and ACI was to transfer and convey to Ken and Reva Puller two million shares of ACI stock. The parties also included in the Second Amendment the requirement that ACI:

> grant and convey to [Ken and Reva Puller], on such terms as are commercially reasonable and pursuant to usual, customary and standard documents acceptable reasonably to Douglass R. Brown Esq., a first, ~~senior and un~~subordinated mortgage in and to certain commercial real estate of ACI which shall, at all times, have a ~~fair market~~ equity value, based upon an orderly liquidation value, of Three million Five Hundred Thousand Dollars ($3,500,000) . . .

(strikeouts in original). The Second Amendment also provided that the parties would negotiate and consummate employment agreements by August 4, 1989, and execute a merger and acquisition agreement by August 11, 1989.

33. Although Brazill drafted employment agreements in accordance with the terms of the Second Amendment to the Preliminary Agreement/Letter of Intent prior to August 3, 1989, Keegan/ACI refused to execute those employment agreements.

34. By August 4, 1989 neither Keegan nor ACI had performed any obligation under the Second Amendment to the Preliminary Agreement/Letter of Intent, including its commitment to deliver $3,500,000 in real estate and two million shares of ACI stock, despite Puller's, Brazill's, and Brown's repeated demands for performance. PMA, on the other hand, was ready, willing, and able to perform its obligations under the contract.[13] Because Keegan and ACI failed to provide Smith Barney with the usual and customary documentation of its purported real estate holdings, August 4, 1989 came and went without an exchange of stock or a transfer of assets, and Smith Barney exited the scene.

35. However, on August 4, 1989, Ron White of White Williams, Inc., an Indianapolis investment banking firm, offered to step into Smith Barney's shoes and provide a mechanism to allow for the swift conversion of the ACI real estate into cash and help ACI satisfy its obligations under the PMA/ACI contract.

36. However, White Williams could not offer to provide PMA warehouse financing, but on August 5, 1989, White Williams agreed to use its best efforts to find someone else willing to immediately fund PMA approximately $250,000 (in cash) and $12,000,000 (in equity) by August 11 or 12, 1989. In so doing, White Williams agreed to seek and obtain the commitment of one or more third party lenders to loan money to ACI (against ACI's real estate holdings) so that ACI could fulfill its obligations to PMA under the Preliminary Agreement/Letter of Intent. With-

---

**11.** According to Brazill, "usual and customary" forms dealing with real estate means "abstracts, title insurance, commitments, deeds. Usual and customary documentation to verify ownership."

**12.** According to Brazill's testimony:

> In very simple words, the real estate was to be conveyed by ACI into or to a separate bank as a trustee; the bank would hold the real estate as trustee. That real estate would be used by the trustee to pledge repayment of ten million dollars to Smith–Barney. Smith–Barney would take the ten million dollars and invest it in Puller Mortgage, and then ACI would have

an obligation to repay those funds to Smith–Barney over a negotiated period of time. The promise of ACI was to be credit-enhanced by deeds of trust, which essentially is the conveyance of the real estate to a trustee, independent third party, who would hold the assets and would, by instruction or by the deed of trust agreement, would either foreclose on the property to repay the loan or release it after ACI performed its obligation to Smith–Barney.

**13.** In response to the question of whether PMA was "ready, willing, and able to perform its obligations?", Brazill testified: "Absolutely. Absolutely, without question."

in a day or so, White Williams located and introduced PMA and ACI to Munier S. Jallad, a local financial advisor with Indiana Overseas Market Consultants; Jallad claimed to have connections with the prosperous Royal Family of Abu Dhabi.

37. On August 10, 1989, in accordance with, and as a result of, the August 5, 1989 meeting/agreement, Jallad, Indiana Overseas Market Consultants, PMA, and ACI formally executed the "Commitment Letter," whereby Jallad and Indiana Overseas Market Consultants agreed to provide ACI either $12,000,-000 or $15,000,000 in funding, using ACI's real estate holdings as collateral, to enable ACI to perform its obligations under the PMA/ACI contract.

38. Towards the end of August 1989, Jallad and Ron White notified PMA and ACI that Jallad had convinced the Abu Dhabi royalty to provide the long-term financing necessary to revitalize PMA. According to Arab custom and protocol, however, Puller, Keegan, Brazill, Brown, and Jallad first had to travel to Abu Dhabi to meet with the royal investors in person.

39. Without an alternative, and faced with the need to keep their businesses and the various contracts and agreements afloat (by this time, it was clear that Puller, Brazill, and Brown were growing frantic, willing to do almost anything to keep from having to scuttle PMA), the intrepid businessmen packed their bags and flew off to Abu Dhabi. On August 28, 1989, Jallad introduced Keegan, Puller, Brazill, and Brown to Nour Eddine–Zerriffi, the putative source of the funds promised in the Commitment Letter. While in Abu Dhabi, Keegan gave Nour Eddine–Zerriffi documents purporting to show control over various parcels of real estate, the

same documentation Keegan had previously given to PMA and Smith Barney.

40. Three days later, on September 1, 1989, Zerriffi, ACI, PMA, and Indiana Overseas Market Consultants executed the "Credit Agreement," whereby Zerriffi agreed to loan Indiana Overseas Market Consultants, for the benefit of ACI and PMA, twenty million dollars by September 7, 1989. The Credit Agreement also provided that Indiana Overseas Market Consultants would induce Merchants National Bank of Indianapolis to issue and deliver to PMA and ACI a twenty million dollar irrevocable direct-pay letter of credit; that five million dollars from the Zerriffi loan would be made available to PMA; and that ACI's real estate holdings would be the collateral for this transaction. Zerriffi also promised ACI and PMA that he would provide, through his Kuwait banking contacts, a seventy-five million dollar warehouse credit line for PMA and ACI.

41. After the businessmen returned to the United States, Zerriffi, through his attorneys, requested documentation verifying Keegan's and ACI's ownership and/or control over the purported real estate holdings. In response, Keegan forwarded the documents which formed trial Exhibit 8, the same set of papers, title searches, and land descriptions rejected by Smith Barney. Not surprisingly, Zerriffi's attorneys expressed doubts concerning Keegan's and ACI's ownership and/or control over the real estate, as well as the claimed net equity value of the real estate.

42. At Zerriffi's attorneys' prodding, Keegan secured from his subscribers typed "Certification" documents, documents in which the ACI subscribers affirmed that ACI had full ownership and control over the claimed real estate.[14] The Certificates failed to satis-

---

14. The "Certification" documents, typed on plain white paper, provided:

The ACI Subscriber has conveyed and transferred to American Capital Investments, Inc. a California Corporation ('ACI'), all right, title, control and interest in and to the ACI Real Estate, pursuant to applicable agreements between ACI and the ACI subscriber.

However, the cover letters attached to those "Certification" documents, which were supplied to the subscribers but not given or shown to Zerriffi, stated in part:

... At the closing, the real estate will be transferred into the trust, as will 20 million in cash from ACI's investor. Cash sufficient to satisfy all of the existing debt on the real estate will continue to be held in the trust and some of it will be used to satisfy the current obligations due on the real estate from you and the other subscribers. The excess funds will be utilized by ACI to fund its transaction with Puller Mortgage, as well as for other agreed upon purposes....

fy Zerriffi that ACI had ownership and control of its purported real estate, however, and Zerriffi elected not to perform his obligations under the "Credit Agreement."

43. All the while that the Zerriffi deal was under negotiations Keegan and ACI had been negotiating the same type of real-estate-for-stock proposal it had made to PMA with two other Indiana businesses, Carpenter Body Works and Hesco Industries. Specifically, Keegan was representing to those Indiana companies (who were both in dire need of capital) that ACI had a net worth of approximately $39,000,000, and that ACI owned and controlled PMA.

44. On February 14, 1990, Keegan called a subscriber meeting, during which he informed his real estate subscribers that funding from Zerriffi was imminent. Keegan informed the subscribers, however, that ACI had committed itself to fund PMA seven to ten million dollars more than the amount the Zerriffi deal was to generate for ACI. The subscribers put the matter to a vote, and with Keegan's concurrence, he and his subscribers agreed to intentionally default on the Preliminary Agreement/Letter of Intent, the Credit Letter, and Credit Agreement.

45. On March 9, 1990, Ken Puller and PMA filed this lawsuit.

46. Unbeknownst to the plaintiffs, California's Department of Corporations, on February 6, 1989, had issued a "Desist and Refrain Order"[15] against Keegan, Richard L.

Eller, Ronald Lee, and the Amaford Corporation, instructing Keegan and Lee to refrain from selling Amaford stock in the state of California. That Desist and Refrain Order provided:

> Pursuant to Section 25532 of the California Corporate Securities Law, you are hereby ordered to desist and refrain from the further offer or sale in the State of California of shares of stock of AMAFORD CORPORATION (formerly AMERICAN AFFORDABLE MANAGEMENT CORPORATION) for the reason that, in the opinion of the Commissioner of Corporations of the State of California, such instruments or interests are securities, the sale of which are subject to qualification under said law; such securities are being or have been offered for sale without first being so qualified, and the issuance of this Order is necessary and appropriate in the public interest and for the protection of investors consistent with the purposes of the policy and provisions of the California Corporate Securities Law of 1968.

> Dated: Sacramento, California

> FEB 6 1989

47. However, according to the "Proof of Service" attached to the Desist and Refrain Order, Keegan was not served with that order until February 5, 1991. Ronald Lee, a Keegan associate and officer of ACI, testified that he, too, did not learn of the Desist and Refrain Order until February of 1991.

---

The attached 'Certification' is, as you can tell, a combination between the Vendor's Affidavit and Estoppel Certificate customarily utilized in U.S. real estate transactions. While it is being requested by ACI's investor in order to accomplish a closing of this transaction, it does not effect ACI's agreement with you, which of course continues in force exactly as previously agreed.

Although it appears that the "Certification" documents are somewhat deceptive, whether they constituted fraud on Zerriffi is not an issue in this case.

15. Section 25532 of the Corporations Code provides:

(a) If, in the opinion of the commissioner, the sale of any security is subject to qualification under this law and it is being or has been offer or sold without first being qualified, the commissioner may order the issuer or offer or such security to desist and refrain from the further offer or sale of such security unless and until qualification has been made under this law.

　　*　　*　　*　　*　　*　　*

(c) If, after an order has been made under subdivision (a) or (b), a request for hearing is filed in writing within one year of the date of service of the order by the person to whom the order was directed, a hearing shall be held in accordance with the Administrative Procedure Act ... Unless the hearing is commenced within 15 business days after the request is filed (or the person affected consents to a later date), such order is rescinded.

If that person failed to file a written request for a hearing within one year from the date of service of the order, the order shall be deemed a final order of the commissioner and shall not be subject to review by any court or agency, notwithstanding Section 25609.

**1518**

## II. Conclusions of Law
### Breach of Contract

■ 1. In order for either plaintiff to recover from defendant Keegan under its breach of contract claim, that plaintiff must prove that a valid contract existed between the plaintiff and Keegan (or ACI); [16] that the plaintiff performed its part of the contract; that Keegan failed to perform his part of the contract; and that the plaintiff was damaged by Keegan's breach. *Strong v. Commercial Carpet Co.*, 163 Ind.App. 145, 322 N.E.2d 387 (1975).

■ 2. A party who acts in good faith and who performs substantially all that is required of him by a contract may recover from the other party—less any damage sustained by the other party for minor defects in performance. Substantial performance is something less than full strict performance, but only in some nonessential way and is practically as good as strict performance. *McConnell v. Fulmer*, 230 Ind. 576, 103 N.E.2d 803 (1952).

■ 3. A party breaches a contract when he places himself in such a position that it is beyond his power to perform his part of the contract or when he fails to perform all the obligations that he agreed to undertake. *See Indiana Gas & Water Co. v. Williams*, 132 Ind.App. 8, 175 N.E.2d 31 (1961).

■ 4. A contract not fully performed on both sides may be rescinded or canceled by mutual agreement of the parties. An agreement to cancel a contract may be expressed orally or in writing, or it may be implied by the conduct of the parties. *Bowyer v. Vollmar*, 505 N.E.2d 162 (Ind.Ct.App.1987).

■ 5. In contract law, the intention of the parties controls the substance of an agreement, and that intention is expressed by the "clear language" of the contract. *Scott v. Anderson Newspapers, Inc.*, 477 N.E.2d 553, 559 (Ind.Ct.App.1985). If the parties' intention is discernable from the written contract and the unambiguous terms of the contract are conclusive, a court must give the clear language evincing the parties' intention effect. *Id.* In other words, parole

evidence regarding the parties' intention cannot change or augment the "clear language" of a contract. *McGann & Marsh Co. v. K & F Mfg. Co.*, 179 Ind.App. 411, 385 N.E.2d 1183 (1979).

■ 6. In an action for breach of contract, a party may recover only such damages as can be said to be the natural and proximate consequence of the breach and reasonably contemplated by the parties at the time the contract was entered into as the probable result of a breach. *See Strong v. Commercial Carpet Co., Inc.*, 163 Ind.App. 145, 322 N.E.2d 387 (1975).

A party injured by a breach of contract may receive, inter alia, consequential damages. *Clark's Pork Farms v. Sand Livestock Sys.* (1990), Ind.App., 563 N.E.2d 1292, 1298. Consequential damages include those that may reasonably be considered to have arisen naturally from the breach or those that may reasonably have been in contemplation of the parties as a probable result of breach of the contract at the time it was entered. *Id.* Consequential damages may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. *Id.* A jury may not award damages on the mere basis of conjecture and speculation. *Farm Bureau Mut. Ins. Co. v. Dercach* (1983), Ind.App., 450 N.E.2d 537, 540, transfer denied. However, lost profits need not be proved with mathematical certainty. *Id.* at 541. Lost profits are not uncertain where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the jury to make a fair and reasonable finding as to the proper damages. *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind.App. 632, 291 N.E.2d 92, 106, reh'g denied (1973), 154 Ind.App. 632, 294 N.E.2d 617, transfer denied. On the other hand, it is wholly improper for the trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain. *Id.* 154 Ind.App. at 107, 291 N.E.2d

**16.** *See Conclusion of Law* number 14, *infra.*

92. ... [C]alculated damages may be recoverable as long as the loss was reasonably in contemplation of the parties at the outset of contractual negotiations, and the damages can be ascertained with a reasonable degree of certainty.

*Insul–Mark Midwest, Inc. v. Modern Materials, Inc.,* 594 N.E.2d 459, 466–67 (Ind.Ct. App.1992).

■■■ 7. In order to recover punitive damages in a contract case, a plaintiff must produce evidence of tortious conduct, an independent tort, and not merely "tort-like" conduct. *Miller Brewing Co. v. Best Beers of Bloomington, Inc.,* 608 N.E.2d 975 (Ind. 1993).

Opinions of this Court have consistently stated the general rule that punitive damages are not allowed in a breach of contract action. *Lawyers Title Ins. Corp. v. Pokraka* (1992), Ind., 595 N.E.2d 244, 250; *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 136; *Travelers Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 362; *Art Hill Ford, Inc. v. Callender* (1981), Ind., 423 N.E.2d 601, 602; *F.D. Borkholder Co., Inc. v. Sandover* (1980), 274 Ind. 612, 616, 413 N.E.2d 567, 57 [sic]; *Hibschman Pontiac, Inc. v. Bachelor* (1977), 266 Ind. 310, 314, 362 N.E.2d 845, 847; *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 607, 349 N.E.2d 173, 183. Such statements suggest that there are exceptions to this rule, but upon close examination of the opinions of this Court, we find that no exceptions have ever been applied. Today we hold that, in fact, no exception exists.

\* \* \* \* \* \*

We hold that in order to recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.

*Id.* at 981, 984. Accordingly, to recover punitive damages in a breach of contract case, a

plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded, such as fraud. *Id.* Indiana no longer recognizes (if it ever did) an exception to the general rule that punitive damages are not allowed for a breach of contract. *Id.* at 981.

8. The parties in this case agree that the Preliminary Agreement/Letter of Intent, as twice amended, constitutes a valid contract. The court concurs, finding that the Preliminary Agreement/Letter of Intent, as twice amended, clearly constitutes a binding contract.[17] *See Venture Associate Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 & 432 (7th Cir.1993).

9. The court finds that the plaintiffs have proved by a preponderance of the evidence that Keegan committed a breach of contract when, on August 4, 1989, he failed to:

... transfer and convey to KAP and RRP, as joint tenants with right survivorship, Two Million (2,000,000) shares of ACI Common Stock, which are, and shall be, fully paid and nonassessable, as contemplated pursuant to the Preliminary Agreement [which provided that the ACI stock "will always be valued at $5.00 per share"]

and:

... grant and convey to [Ken and Reva Puller], on such terms as are commercially reasonable and pursuant to usual, customary and standard documents acceptable reasonably to Douglass R. Brown Esq., a first, ~~senior and~~ unsubordinated mortgage in and to certain commercial real estate of ACI which shall, at all times, have a [sic] ~~fair market~~ equity value, based upon an orderly liquidation value, of Three million Five Hundred Thousand Dollars ($3,500,-000) ...

(strikeouts in original) as he was so obligated under Section 1.2 of Preliminary Agreement/Letter of Intent, and Section 2.1(a) of

---

**17.** Section 7 of the Preliminary Agreement/Letter of Intent provides:

7. *Binding Commitments.* The commitments expressed are binding commitments on ACI,

PMA, KAP, and LAK, and all parties agree to comply with the terms of those paragraphs. ...

the Second Amendment to the Preliminary Agreement/Letter of Intent, respectively.[18]

■ 10. Based on the clear language of the contract, the court concludes that Keegan was obligated to deliver title to the real estate holdings with which PMA was going to secure a loan for recapitalization. Keegan promised to deliver millions of dollars in collateral which he did not own or subsequently acquire, and when each of the would be investors realized in succession that Keegan did not own or had not acquired the collateral, not surprisingly, the investors, first Smith Barney and then Zerriffi, refused to issue unsecured and uncollateralized loans. Further, this court finds that the only evidence of "ownership" or "control" Keegan ever provided to PMA, Smith Barney, or Zerriffi was those documents introduced into evidence as Exhibit 8, and because those documents were not in the usual and customary form to establish land ownership or the type of documents normally accepted by credit institutions for asset-based lending, Keegan breached his obligations under the Preliminary Agreement/Letter of Intent, as twice amended.

11. In sum, the court concludes that while the plaintiffs were prepared to comply with their obligations under the contract (principally, to convey $10,000,000 in PMA stock to Keegan and ACI and for Puller to remain as the head of PMA for at least five years), Keegan failed to discharge his obligations under the Preliminary Agreement/Letter of Intent, which included his promise to "transfer, deliver and convey, to PMA, good and merchantable title to ... net equity in real estate...."

■ 12. To the extent Keegan claims that "employment issues" and the settlement of the Colorado Judgment were what actually kept him from performing, the court con-cludes that those reasons are not credible. (*See Finding of Fact # 8*, footnote 4). The court finds that the plaintiffs and Keegan had distilled the essence of the employment agreements into the Preliminary Agreement/Letter of Intent and had reached reasonable agreements regarding the additional issues of employment (in accord with the terms of the Preliminary Agreement/Letter of Intent), but that Keegan simply refused to execute those additional employment agreements. The court further concludes that, to the extent the parties failed to execute the employment agreements, those agreements were incidental to performance under the Preliminary Agreement/Letter of Intent (the "employment agreements" were to be executed as "Post–Stock Exchange Date Matters"), and, in any event, the failure to execute those agreements did not constitute a material or substantial breach by plaintiffs excusing performance by Keegan.

■ 13. Generally, directors and officers of a corporation are not individually liable for the debts and contracts of their corporation. There are two exceptions to that general rule: (1) Where an officer has personally guaranteed the corporation's obligation so as to assume liability as a guarantor, and (2) where (a) an officer has demonstrated disregard of the corporate form, treating the corporation essentially as conduit for personal business affairs and (b) the imposition of personal liability is necessary to avoid injustice. *Weeks v. Kerr*, 486 N.E.2d 10, 12 (Ind.Ct.App.1985). Here, the court concludes that the plaintiffs have proved that Keegan personally guaranteed his and ACI's obligation to perform under the contract, and accordingly, the court finds Keegan personally responsible for his and ACI's breach of contract.

---

**18.** The court finds that the plaintiffs also have proved by a preponderance of the evidence that defendant Keegan breached the unamended Preliminary Agreement/Letter of Intent when he failed to:

make available to PMA, good and merchantable title to net equity in real estate ... which are acceptable as collateral by commercial banks for commercial and/or asset based loan under usual, ordinary and customary credit terms, in such amounts and character to enable PMA to procure a credit facility, short term loan or credit line in the immediately available minimum amount of $1,500,000

on June 9, 1989. That breach was waived, however, when the parties executed the First Amendment to the Preliminary Agreement/Letter of Intent, which extended the time for performance to August 15, 1989. *Bowyer v. Vollmar*, 505 N.E.2d 162 (Ind.Ct.App.1987).

14. Accordingly, the court finds that PMA is entitled to a compensatory award of $18,550,000, which amount represents the benefit PMA was to receive from the $15,000,000 equity infusion and the profits it reasonably expected to receive from the NYLife offering. *See Finding of Fact # 11.* Although PMA had requested substantially more damages, including $20,500,000 in expected profits over the next five years, the court finds those damage figures too speculative a basis for such an award. The court also declines to award prejudgment interest to PMA. *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 365 (Ind.1982).

15. The court finds that Ken Puller personally is entitled to a compensatory award of $3,680,200, which amount represents the benefit Puller was to reap had the Preliminary Agreement/Letter of Intent not been breached by Keegan. This figure includes the salary Puller was to receive over the term of a five year employment contract and the $3,000,000 incentive signing bonus, reduced by the value, if any, of the PMA stock Puller was to convey to Keegan. This figure does not include a percentage of projected PMA estimated profits, as this court finds such damages to be too speculative a basis for such an award, nor does this damage award figure include the supposed $10,000,000 value of the ACI stock, as this court finds that ACI was essentially a shell corporation and that its stock, although it may have had a "stated" or "assigned" value of $5 per share, was worthless. Accordingly, to put Puller in the position he would have been in had the Preliminary Agreement/Letter of Intent not been breached, Keegan is liable to Ken Puller for the amount of $3,680,200. The court does not award prejudgment interest to Puller. *Id.*

### Fraud

16. In the remaining counts, the plaintiffs claim that defendant Keegan committed common law fraud (against Puller), fraud upon a financial institution (against PMA),[19] Deception,[20] and state and federal securities fraud. The plaintiffs also claim that Keegan engaged in a pattern of racketeering, in violation of state (Ind.Code § 34-45-6-1, *et seq.*) and federal (18 U.S.C. § 1961) RICO statutes. All of these claims, however, are based on and are essentially permutations of the fraud allegation.

17. In order to prove fraud, a plaintiff has the burden of proving:

(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightly relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of.

*Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind.1992).

18. "Fraud" is any cunning, artifice, or device used to cheat or deceive another. *Plymale v. Upright,* 419 N.E.2d 756, 763 (1981) (citing *Daly v. Showers,* 104 Ind.App. 480, 8 N.E.2d 139 (1937) and 26 C.J.S. *Fraud* § 1 (1921), p. 1059).

19. Reliance upon a misrepresentation is a material element of a cause of action for fraud. *Plymale v. Upright,* 419 N.E.2d at 761. Reliance consists of two distinct parts: The fact of reliance and the right of reliance. *Id.* The fact of reliance is simply that: A plaintiff relied on a misstatement, and is, compared to the right of reliance, "by far the easier to determine." *Id.* The right of reliance is not so easy to prove:

The right of reliance is more difficult to determine for the reason it is tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations.

---

**19.** The term "state chartered institution" means a bank, banking association, land bank, intermediate credit bank, bank for cooperatives, production credit association, land bank association, mortgage association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States or of the state.

**20.** Ind.Code § 35-43-5-3.

In the course of daily interaction and business dealing the average person encounters a barrage of opinions, advice, advertisements, estimates, and even "guestimates." He simply cannot believe, or rely upon, everything he is told. ·"The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and sagacity enable them to protect themselves." *McKee v. State,* (1887) 111 Ind. 378, 381, 12 N.E. 510. However, it is also settled that where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment. *Gatling v. Newell,* (1857) 9 Ind. 572.

*Id.* 419 N.E.2d at 762.

■ 20. False statements sufficient to sustain an action for fraud must relate to present or preexisting facts. Fraud cannot be predicated on unfulfilled promises or statements concerning future events. *Comfax Corp. v. North American Van Lines, Inc.,* 587 N.E.2d 118, 125 (Ind.Ct.App.1992).

■ 21. An expression of opinion or belief, or, more precisely, a representation which is expressed and understood as nothing more than a statement of opinion, cannot constitute fraud. *Plymale v. Upright,* 419 N.E.2d at 763 (citing 37 C.J.S. *Fraud* § 10, pp. 226–227).

■ 22. A review of the evidence, in particular, Exhibits 8, 9, and 17, reveals that even if Keegan did represent that either he or ACI actually owned the real estate that was to be the collateral for these transactions, as compared to his merely controlling or having access to real estate, the documentary information he provided plaintiffs clearly conflicted with his verbal representation. For example, one of the documents which Keegan supplied to PMA, Smith Barney, and eventually Zerriffi specifically states:

ACI is just finishing Phase One and has not formally transferred all the properties into the Company name as of this date. The transfer will happen simultaneously with the closing of Phase One and the formal conveyance into the Credit Facility

as required to collateralize the Fifteen Million ($15,000,000) Dollar loan.

Exhibit 17, p. 1. Further, a review of the much-discussed and debated Exhibit 8 reveals that the supposed ACI real estate was actually owned by the ACI subscribers. Typical of the documents included in Exhibit 8 are title reports, which state:

We find fee simple title to the hereinafter described real estate to be vested in:

McKEES MILL COLONY, INC.

and:

We find fee simple title to the hereinafter described real estate to be vested in:

PROJECT I–70, an Ohio Limited Partnership . . . .

A reasonable inquiry, indeed, even a cursory reading of the documents comprising Exhibit 8, coupled with a reading of the subscription agreements (Exhibit 9) supplied by Keegan, would have informed PMA that the ACI subscribers maintained ownership of the land, but had made arrangements with ACI and Keegan to transfer that ownership into a credit facility controlled by ACI on the closing date of the Preliminary Agreement/Letter of Intent. Further, while the court finds Keegan's representations of "controlling" the subscribers real estate neither clear nor forthcoming, the court concludes that those statements were essentially Keegan's opinions and characterizations of his ability to transfer the land into a credit facility on the closing date of the Preliminary Agreement/Letter of Intent. In the alternative, to the extent that Keegan asserted ownership of the subscribers' real estate, the court finds that, based on the information Keegan supplied PMA and Puller, specifically, Exhibits 8, 9, and 17, the plaintiffs were not entitled to reasonably rely on that characterization. Finally, the court finds, as a matter of fact, that the plaintiffs, Brazill, and Brown never actually believed that Keegan or ACI owned the claimed property, which explains why in the Second Amendment to the Preliminary Agreement/Letter of Intent, the parties added the requirement that ACI:

grant and convey to [Ken and Reva Puller], on such terms as are commercially reasonable and pursuant to usual, custom-

ary and standard documents acceptable reasonably to Douglass R. Brown Esq., a first, ~~senior and un~~subordinated mortgage in and to certain commercial real estate of ACI which shall, at all times, have a ~~fair market~~ equity value, based upon an orderly liquidation value, of Three million Five Hundred Thousand Dollars ($3,500,000). . . .

 23. As to the claim that Keegan committed fraud when he failed to disclose the California Desist and Refrain Order, the court finds that there is a dearth of evidence to prove that Keegan, himself, knew about that order before February 5, 1991, the date of the service on him. As such, any omission made prior to February 5, 1991, to the extent that it would have been material, was not made knowingly and thus does not constitute fraud. In the alternative, because the California order only applied to Keegan's offering of Amaford stock in California, and the sale of Amaford stock was not a material part of the Preliminary Agreement/Letter of Intent, the plaintiffs have failed to prove that they justifiably relied to their detriment on that omission.

24. Because the court has concluded that Keegan did not make any material misstatement or omission of fact, and that, even if he did, the plaintiffs did not reasonably rely on such, the plaintiffs have failed to prove their claims of fraud, fraud on a financial institution, or any other such fraud-based claim.

25. Any conclusion of law stated above, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court. In addition, any finding of fact stated in the *Findings of Fact* section, to the extent it constitutes a conclusion of law, is hereby incorporated by reference as an additional *Conclusion of Law.*

### III. Conclusion

In accordance with the above *Findings of Fact* and *Conclusions of Law,* the court hereby finds Keegan liable to the plaintiffs on the breach of contract claim and awards to Ken Puller the amount of $3,680,200 and to PMA the amount of $20,500,000. The court finds

that Keegan is not liable to plaintiffs on the remaining fraud based claims.

Keegan's motion to file an amended counterclaim is DENIED, the plaintiffs' motion for sanctions is DENIED, and the plaintiffs' motion for attorney's fees is DENIED.

It is so ORDERED.