R. Jeannette **LYCAN**, Gray Farms, Inc., an Illinois Corporation, and David Pauley as Trustee Under The Will of Millard Pauley, Deceased, Plaintiffs,

v.

Gary W. **WALTERS**, Frances N. Browning, Prime Corporation, Inc., an Indiana Corporation, J. Albert Garcia, Rally Ventures, Ltd., a New York Corporation, The Rally Group, Ltd., a California Corporation, John Collins, Mark E. Maddox, and Coons & Saint, Douglas R. Brown, and Stewart & Irwin, Defendants.

Civ. A. No. IP 92–925–C.

United States District Court, S.D. Indiana, Indianapolis Division.

Oct. 11, 1995.

John W. Lawson, Indianapolis, IN, for Plaintiff.

Thomas J. Werner, Indianapolis, IN, for Defendant Prime Corporation.

Eric Redman, Cohen & Malad, Indianapolis, IN, for Defendants Garcia, Rally Ventures and Rally Group.

Gary P. Price, Brett J. Miller, Lewis & Kappes, Indianapolis, IN, for Defendants Maddox, Coons & Saint.

Richard Ewing, Stewart & Irwin, Indianapolis, IN, for Defendants Brown and Stewart & Irwin.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This case comes before the Court on four separate motions for summary judgment filed by three groups of Defendants and by the Plaintiffs in a complex securities action. The first group of moving defendants includes J. Albert Garcia, Rally Group, Ltd.; and Rally Ventures Ltd. (collectively "Rally Defendants"). The second group includes attorney Douglas R. Brown and his firm, Stewart & Irwin (collectively "Brown/S & I"). The third includes attorney Mark E. Maddox and his law firm, Coons & Saint (collectively "Maddox/C & S"). For the reasons set forth below, this Court GRANTS in part and DENIES in part the motion of the Rally Defendants; GRANTS the motion of Defendants Brown/S & I; GRANTS the motion of Defendants Maddox/C & S; and DENIES the motion of Plaintiffs Jeannette Lycan, David Pauley, and Gray Farms, Inc.

## I. BACKGROUND

### A. GENERAL

At the heart of this case lies a complex investment transaction. The events unfolded after Prime Battery Manufacturing Co. ("Prime Battery") declared bankruptcy. Gary Walters ("Walters"), Norman Reinbold ("Reinbold"), and Warren Spangle ("Spangle") incorporated Prime Corporation for the purpose of acquiring the assets of Prime Battery out of bankruptcy. Walters, Reinbold, and Spangle acted as incorporators for the corporation. Spangle served as Chairman of the Board for Prime Corporation and owned a seven percent interest in the company. Reinbold owned a five percent interest. Frances Brownsing ("Brownsing") owned fifty-one percent of the company and was the controlling shareholder. Prime Corporation also contracted with John Collins ("Collins") and New Image Public Relations ("New Image") "to act in the capacity as the Financial PR firm for Prime Corporation." Pls.Statement of Gen.Iss.Opp. the Mot. of the Rally Defendants for Summ.J., Ex. 3, p. 3 (hereinafter "Pls.Statement (Rally Defendants)").

The parties intended a two-step process. First, Prime Corporation would merge with Rally Ventures Ltd., a California corporation controlled by J. Albert Garcia. Second, the stock of Prime Corporation would be used to acquire Prime Battery's assets. Two attorneys were retained by Prime Corporation to assist with these transactions. Douglas R. Brown ("Brown") was hired to get the Prime Battery assets out of bankruptcy; Brown also served as corporate counsel for Prime Corporation. Mark E. Maddox ("Maddox") was hired to do the necessary securities work.

The Plaintiffs in this matter are R. Jeannette Lycan ("Jeannette Lycan"); Gray Farms, Inc. ("Gray Farms"); and David Pauley, the trustee under the will of Millard Pauley (collectively "the Plaintiffs" or "Plaintiffs"). Jeannette Lycan is the wife of Wayne Lycan and the mother of Steven Wayne Lycan ("Steve Lycan").[1] At the time of these transactions, Wayne and Jeannette Lycan were retired farmers in southern Illinois. Millard Pauley, who is now deceased, was also a retired farmer in southern Illinois. Gray Farms is a family owned farm corporation in southern Illinois; Ronald Gray is the President of Gray Farms.

---

1. Though Steve Lycan is not a plaintiff in this matter, he contributed $20,000 as part of the investment by Gray Farms. Steven Lycan Aff., ¶ 46, p. 7.

Walters, along with several other individuals, solicited the Plaintiffs to invest in the acquisition of Prime Battery. In April 1991, Wayne Lycan went to the Prime Battery plant in Anderson, Indiana to see the assets and new equipment. Steven Lycan Aff., ¶ 14, p. 3 (hereinafter "Lycan Aff."). Steve Lycan recalled his mother telling him in late May of 1991 that she had invested $2,000.00 in the Prime Battery deal. Lycan Aff., ¶ 10, p. 2. Lycan also stated that, on July 12, 1991, his mother loaned $100,000.00 to Prime Corporation. Lycan Aff., ¶ 48, p. 7. During the months of July, August, and September, Plaintiffs assert that an additional $125,-000.00 passed from Jeannette Lycan to Prime Corporation, yielding a total investment of $227,000.00 by Jeannette Lycan. First Amended Complaint, ¶ 37, pp. 12–13.

In July 1991, Walters and his accountant, Azeem Meo ("Meo"), visited the residence of Millard Pauley and made a presentation to a few farmers about Prime Battery. Ronald Gray Aff., ¶ 5, p. 2 ("Gray Aff."). Among those present at this meeting were Steve Lycan and Ronald Gray. Walters told the group he was looking for a short term loan to bring Prime Battery into production, and he promised a return of fifty percent for use of the money for ninety days. Gray Aff., ¶ 5, p. 2. At Walters' invitation, Steve Lycan and Ronald Gray visited Indiana to see the Prime Battery plant and to meet the attorneys handling the bankruptcy (Brown) and the securities matters (Maddox). Gray Aff., ¶ 7, p. 3. After this visit, Gray Farms and Millard Pauley decided to invest in the transaction. Gray Farms invested $60,000.00—including $20,000.00 from Steve Lycan. Lycan Aff., ¶ 46, p. 7. Millard Pauley invested an additional $50,000.00. Lycan Aff., ¶ 47, p. 7. Accordingly, the total investment by Jeannette Lycan, Millard Pauley, and Gray Farms was $337,000.00.

The Plaintiffs' investments were to be treated as a stock sale rather than as a loan. Lycan Aff., ¶ 35, p. 6. These investments were to be secured by the assets of Prime Battery, as described in the collateral escrow agreement and the addendum to that agreement. Lycan Aff., Exs. 50, 51. This agreement and addendum were signed by Maddox

as escrow agent; by Brownsing, both individually and on behalf of Prime Corporation; by Ron Gray on behalf of Gray Farms; and by Jeannette Lycan. Walters also signed the addendum in an individual capacity. Millard Pauley's signature does not appear on either the agreement or the addendum. Lycan Aff., Ex. 51. The transaction was structured as a loan, and the Plaintiffs were to receive their money back—with fifty percent interest—in 90 days, which was around October 18, 1991.

Eventually, the investment transaction collapsed. The attempt to recover Prime Battery's assets out of bankruptcy failed. The intended merger of Rally Ventures Ltd. with Prime Corporation was never completed. When the transaction unraveled, Plaintiffs filed the present action against these eleven Defendants. Three separate groups of Defendants have now filed motions for summary judgment, and the Plaintiffs have responded with their own motions for summary judgment against each group of moving Defendants. For the purpose of clarity, the specific facts relating to each group of Defendants moving for summary judgment will now be set forth separately.

### B. THE RALLY DEFENDANTS

At all times relevant to this litigation, J. Albert Garcia ("Garcia") owned all the stock of the Rally Group, Ltd. ("Rally Group"), a California Corporation. In turn, Rally Group owned a controlling interest in Rally Ventures, Ltd. ("Rally Ventures"), a New York corporation listed on the NASDAQ stock exchange. Accordingly, Garcia controlled both companies. Def.Br. in Supp. of Mot. for Summ.J., 1 (hereinafter "Garcia Br.").

In 1991, Garcia negotiated a stock option sale with Prime Corporation. Garcia.Br., 1. In May 1991, Garcia agreed—in principle—to sell 1.5 million shares of Rally Ventures to Prime Corporation for $750,000.00. At that time, the parties intended that Prime Corporation would merge into Rally Ventures and operate as a subsidiary. Lycan Aff., Ex. 55. Rally Ventures, Rally Group, Prime Corporation, Garcia, and Brownsing executed a Letter of Intent ("Letter" or "Letter of Intent")

to this effect on May 21, 1991. Lycan Aff., Ex. 55.

In briefs and motions, Plaintiffs have focussed heavily upon the language of this Letter of Intent. The Letter states the parties' intention "to acquire a controlling interest in the issues and outstanding shares of Prime Corporation...." The parties note that "[t]he transactions contemplated herein are subject to the final approval of the Bankruptcy Court in the bankruptcy proceeding for Prime Battery Manufacturing, Inc....." The Letter also provides that "Rally and Prime shall execute a final agreement upon the completion of their due diligence." In Paragraph 8A, the Letter states: "Upon the execution of this Letter, payment of Fifty Thousand Dollars ($50,000), and receipt of the promissory notes and guarantees described below, Rally shall deliver to Frances Brownsing One Hundred Thousand (100,000) shares of Rally common stock that is restricted." Lycan Aff., Ex. 55.

In a press release dated June 4, 1991, Rally Ventures "announced the agreement in principle and signing of a letter of intent to acquire substantially all of the assets and stock of Prime Corporation of Indianapolis, Indiana." Lycan Aff., Ex. 60.

Ultimately, the transactions contemplated in the Letter of Intent collapsed. On September 23, 1991, Garcia sent a letter to Prime Corporation, Wayne Lycan, and several others stating: "Your inability to comply with the original subject agreement ... leave[s] us no recourse but to advise you that you are in default on all prior agreements...." Lycan Aff., Ex. 54. This letter also states that all sums advanced to Garcia and the Rally Group would be retained as liquidated damages. Over the course of these transactions, the Rally Defendants derived a substantial amount of revenue, and they continue to retain all of the funds remitted to them prior to the collapse of the proposed merger.

## C. DEFENDANTS BROWN/S & I

During the relevant time period, Brown was an attorney licensed by the State of Indiana and engaged in the practice of law with the law firm of Stewart & Irwin ("S & I"). In early 1991, Brown became involved in the transactions which are the subject of the present dispute. In an engagement letter dated March 14, 1991, Brown stated that "this letter will confirm that Stewart & Irwin is prepared to assist Prime Group in its proposed acquisition of the assets of Prime Battery Mfg. Co, Inc." Pls.Statement of Gen.Iss.Opp. the Mot. of Brown/S & I for Summ.J., Ex. 1, p. 1 (hereinafter "Pls.Statement (Brown/S & I)").[2] Copies of this letter were sent to Norman Reinbold & Associates and to Spangle. Pls.Statement Brown/S & I, Ex. 1, p. 1.

Plaintiffs note that Brown had a twenty-seven minute telephone conversation with Wayne Lycan on July 8, 1991, and a three minute telephone conversation with Wayne Lycan on July 9, 1991. Pls.Statement Brown/S & I, Ex. 10, p. 41. According to Plaintiffs, these telephone conversations concerned the details of a proposed $100,000.00 loan from Jeannette Lycan to Prime Corporation.

In his affidavit, Steve Lycan stated that his father told him "that he and mom were thinking about making a substantial loan of money to Prime Corporation, and I personally wanted to go talk to the lawyers and look at the assets." Lycan Aff., ¶ 14, p. 3. Millard Pauley, Wayne Gray, and Steve Lycan decided that they could not make a decision to invest without going to see the two lawyers and look at the battery plant. Lycan Aff., ¶ 15, p. 3. Because of Millard Pauley's health and age and Wayne Gray's schedule, Ron Gray and Steve Lycan "were directed by the others to go look at the plant and the

2. The Plaintiffs most recent brief asserts that Brown in fact represented "Prime Group," which they contend "later was expanded to include Plaintiffs as lender-investors who paid attorney fees." Pls. Statement (Brown/S & I), 2. However, Plaintiffs offer no factual support for this assertion. Brown has consistently contend- ed that he was employed by Prime Corporation. This Court does not believe that the use of the word "group" in the engagement letter generates any doubt as to whether Brown represented Prime Corporation or creates any genuine issue necessitating trial.

assets, talk to the lawyers, and to report back which we did." Lycan Aff., ¶ 15, p. 3.

On July 17, 1991, Ron Gray ("Gray") and Steve Lycan went to Stewart & Irwin with Walters and Meo. Walters introduced Gray and Steve Lycan to Brown as potential investors present to discuss the status of Prime Battery assets in the bankruptcy court. Lycan Aff. ¶ 18, p. 3. Gray expressed concern that bankruptcies could drag on for years. Lycan Aff. ¶ 19, p. 4. Brown told Steve Lycan and Gray that the bankruptcy was ninety-five per cent complete and that there was no problem at all with finishing it up. Lycan Aff. ¶ 19, p. 4. Brown also told them that the beautiful part about a bankruptcy is that the assets have been "cleansed." Lycan Aff. ¶ 19, p. 4. At that point, Steve Lycan asked Brown why Brown did not invest some of his own money if Prime Battery was such a good deal; Brown replied that his father was a small town judge and that he did not have the capital to make that kind of investment. Lycan Aff. ¶ 20, p. 4. Following this meeting, Steve Lycan and Gray went to look at the Prime Battery plant with Walters and Meo. Lycan Aff., ¶ 25–26, pp. 4–5. Following the visit to the Prime Battery plant, Steve Lycan, Gray, and Walters went to meet with Maddox. Steve Lycan and Gray then returned to Illinois, where they decided to invest in the transaction. Gray Farms invested $60,000.00, and Millard Pauley invested another $50,000.00. Under the terms of the loan transaction, the Plaintiffs were to receive their money back around October 18, 1991.

Following the Plaintiffs' loans to Prime Corporation, questions arose relating to their status. More specifically, Maddox lacked certain documentation showing that the Plaintiffs qualified for the accredited investor exemption under the Illinois securities act. As a result, Maddox recommended that the Plaintiffs be given an opportunity to receive their money back or to reaffirm their investment in Prime Corporation. Lycan Aff., Ex. 58. The facts do not clearly show whether such a recision offer was made; however, Steve Lycan recalled that he and his parents were told to be present at a meeting on September 26, 1991, so that they could get their money back. Lycan Aff., ¶¶ 52, 53, p. 7.

On September 26, 1991, Wayne, Jeannette, and Steve Lycan attended a meeting in the conference room of Stewart & Irwin. Lycan Aff., ¶ 53, p. 7. In addition to the Lycans, the meeting was attended by Warren Spangle, Larry Baker, Norman Reinbold, Maddox, Walters, and Brown; Brownsing attended by telephone. Lycan Aff., ¶ 53, p. 8. As this meeting progressed, the Lycans realized that they were not going to get their money back that afternoon and left the room; Brown caught them at the elevator and said he thought it would be in their best interest to return to the meeting since the people at the meeting were making headway. Lycan Aff., ¶ 55, p. 8. The Lycans returned and remained for the full meeting. Lycan Aff., ¶ 55, p. 8. The Plaintiffs do not identify any other statements by Brown at this meeting.

During his work for Prime Corporation, Brown drafted two loan Agreements. One was an eleven-page Credit Facility Trust Agreement. Lycan Aff., Ex. 31, p. 33. This agreement recites on the last page that it was prepared "solely on behalf of Prime Corporation, by Douglas R Brown, Stewart & Irwin." Lycan Aff., Ex. 31, p. 43. This agreement was signed by Frances Brownsing in an individual capacity. Lycan Aff., Ex. 31, p. 43.

Brown also drafted the Loan Agreement of July 19, 1991 to be signed by Maddox as Escrow Agent for Plaintiffs, by Frances Brownsing for Prime Corporation, and by Plaintiffs Jeannette Lycan, Gray Farms, and Millard Pauley. Lycan Ex. 50, p. 80. At the bottom of the last page of this agreement there appeared a recitation that the agreement and the attached exhibits were prepared "solely on behalf of Prime Corporation by Douglas R. Brown, Stewart & Irwin." Lycan Ex. 50, p. 81.

### D. DEFENDANTS MADDOX/C & S

At all relevant times, Maddox was an attorney licensed in Indiana and practicing with the firm of Coons & Saint ("C & S"). Maddox became involved in the transactions underlying this dispute in early 1991. On April 30, 1991, Prime Corporation retained

Maddox as "special securities counsel." Maddox/C & S Br. in Supp. of Mot. for Summ.J., Ex. A (hereinafter "Maddox/C & S Br."). Maddox/C & S agreed to counsel Prime Corporation "regarding all securities issues related to the acquisition by the Company of Prime Battery Manufacturing, Inc., which is currently the debtor in a Chapter 7 bankruptcy proceeding." Maddox/C & S Br., Ex. A. On May 29, 1991, Maddox wrote a letter to Walters, Brownsing, Spangle, and Prime Corporation advising that certain securities filings were necessary. Lycan Aff., Ex. 56.

As noted in the discussion of facts relating to Brown/S & I, Steve Lycan, Gray, and Walters visited the Prime Battery plant on July 17, 1991, after meeting with Brown at the offices of Stewart & Irwin. Following their visit to the plant, Steve Lycan, Gray, and Walters went to meet with Maddox at the offices of C & S. Lycan Aff., ¶ 28, p. 5. Walters introduced Maddox to Steve Lycan and Gray as the Indiana securities commissioner, which Maddox corrected to "former" securities commissioner. Gray Aff., ¶ 20, p. 5. Steve Lycan asked Maddox why he didn't stick with it; Maddox responded that he had done his service to society and basically stated that it was time to make some money. Lycan Aff., ¶ 28, p. 5.

Walters told Maddox that Steve Lycan and Gray were potential investors from Illinois who had just viewed the assets and who may make a short term loan to Prime Corporation. Lycan Aff., ¶ 29, p. 5. Gray stated to Maddox that he and Steve Lycan had not yet decided whether or not to invest and that, if they decided to invest, they wanted to be sure that there were sufficient assets collateralized for them to get their money back. Gray Aff., ¶ 21, p. 5. Walters and Maddox discussed the 510,000 shares of Prime Corporation control stock owned by Brownsing. Lycan Aff., ¶ 32, p. 5. Walters also told Maddox that he wanted all the collateral in one pot so that everyone would be protected and know where they stand. Lycan Aff., ¶ 31, p. 5. Gray recalled that Walters orchestrated this meeting. Gray Aff., ¶ 22, p. 5.

Walters suggested to Maddox that he should call Collins to determine how to structure the loan. Lycan Aff., ¶ 34, p. 5. Maddox then telephoned Collins, placing the call on the speakerphone so everyone could hear how the loan would be handled. Lycan Aff., ¶ 34, p. 5. Collins suggested that the loan should be accomplished through stock rather than as a direct loan to the corporation. Lycan Aff., ¶ 35, p. 6. Maddox told Collins he could live with that. Lycan Aff., ¶ 36, p. 6. After the phone conversation concluded, Steve Lycan asked if matters could be put in writing so that "if push comes to pull, we could take our truck and cutting torches and go retrieve the Prime Battery assets, with no ifs, ands or buts." Lycan Aff., ¶ 37, p. 6. Maddox responded that such an instrument could be drawn up and that the collateral should be handled with an escrow account. Lycan Aff., ¶ 38, p. 6. Steve Lycan and Gray told Maddox that they would be more comfortable if he would be their escrow agent since he was familiar with what they wanted; Maddox agreed he would act as escrow agent for sixty days, at which time Steve Lycan and Gray would have to find a new agent. Lycan Aff., ¶ 38, p. 6; Gray Aff. ¶ 28, p. 7. Steve Lycan also requested that his parents' loan be included in the collateral escrow agreement; Maddox agreed to do so. Lycan Aff., ¶ 40, p. 6. Jeannette Lycan's loans to Prime Corporation were included as Maddox stated they would be.

While returning back to Illinois, Steve Lycan and Gray discussed their concern that Prime Corporation might obtain more loans than the assets were worth, so they stopped at a truck stop to call Maddox. Lycan Aff., ¶ 43, p. 6. Steve Lycan informed Maddox of their fear that Walters might "over collateralize" the potential loan. Lycan Aff., ¶ 44, p. 6. Maddox stated that he understood and that $400,000.00 should be the limit. Lycan Aff., ¶ 45, p. 7. Steve Lycan asked that this limit be put in writing, and Maddox agreed to do so. Lycan Aff., ¶ 45, p. 7. Wayne and Jeannette Lycan's loans to Prime Corporation were included in the escrow agreement, as Maddox agreed they would be. The $400,000.00 limit was also included. Lycan Aff., Ex. 52, 53.

Maddox signed the seventeen-page Credit Facility and Escrow Agreement as Escrow

Agent. Lycan Aff., Ex. 50. Maddox also prepared a three-page addendum to this Agreement, which he also signed as escrow agent. Lycan Aff., Ex. 51.

On August 9, 1991, Maddox wrote a letter to Walters, Brownsing, Spangle, and Prime Corporation, with a copy to Brown, stating that on August 8, 1991, he was informed that a number of sales of Prime Corporation stock had been made to investors residing in Illinois and that, given the risk that securities violations might have occurred, a recision offer should be made to give the investors an opportunity to receive their money back or to reaffirm their investment in Prime Corporation. Lycan Aff., Ex. 58. As noted previously, the facts do not clearly show whether any recision offer was made, but the Lycans were told to be present at the September meeting to get their money back. Lycan Aff., ¶¶ 52, p. 7.

On August 21, 1991, Maddox wrote another letter to Walters, Brownsing, Spangle, and Prime Corporation stating that:

> As you know, to meet the accredited investor exemption under the Illinois Act, one must have a net worth in excess of $1 million, or had income in the last two years and expect to have income in the current year in excess of $200,000 per year.

Lycan Aff., Ex. 59. Maddox also stated that he had not received the required documents from Gray Farms, Inc., Mrs. Millard Pauley, and Jeannette Lycan. Lycan Aff., Ex. 59. Also, as previously noted, Maddox attended the September 26 meeting at the offices of Stewart & Irwin. At this meeting, Maddox stated that he still did not have the required documentation from Jeannette Lycan, Gray Farms, Inc., or Mrs. Millard Pauley. Lycan Aff., ¶ 57, p. 8.

Some time after October 2, 1991, Steve Lycan went to see Maddox at his law offices and inquired when his mother would be paid. Lycan Aff., ¶ 71, p. 10. Maddox responded that nothing could be done until after October 18, 1991, the final due date for the Plaintiffs' money. Lycan Aff., ¶ 71, p. 10.

Plaintiffs assert that Maddox/C & S received certain money for their involvement in the transactions at issue. On May 27, 1991,

Jeannette Lycan paid $2,000.00 for Rally stock. Lycan Aff., Ex. 8. Brownsing cashed this check and paid the proceeds to Maddox. On July 12, 1991, Maddox received a $5,000.00 check showing Prime Corporation as the remitter. Lycan Aff., Ex. 38. On July 31, 1991, Maddox received a $10,000.00 check showing Frances M. Brownsing or "Jeanetta Lycan" as the remitter. Lycan Aff., Ex. 12 [sic].

Steve Lycan recalled that: "From the time we parted with our money until 9/26/91 I talked with Mark Maddox physically or by telephone approximately ten time, mostly to see how things were going." Lycan Aff., ¶ 58, p. 8 [sic].

Maddox/C & S attach portions of Jeannette Lycan's deposition to their summary judgment brief. In her deposition, Jeannette Lycan stated that Maddox never told her that he was her personal attorney. Jeannette Lycan Dep., pp. 100–01. She admitted that Maddox had never sent her a letter stating he was her personal attorney and that he never represented that she should rely upon him as her attorney. Jeannette Lycan Dep., pp. 100–01, 123. Rather, she noted that she understood Maddox to be the attorney for Prime. Jeannette Lycan Dep., p. 253. She also indicated that Maddox did not write to her or the other Plaintiffs, did not telephone any of the Plaintiffs, and did not bill or receive any money from the Plaintiffs. Jeannette Lycan Dep., p. 161. Jeannette Lycan admitted that Maddox/C & S were paid by Prime. Jeannette Lycan Dep., p. 158. She also indicated that Maddox did not conceal anything from her incident to her investment in Prime. Jeannette Lycan Dep., p. 291.

## II. ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party moving for summary judgment initially has the burden of

showing the absence of any genuine issue of material fact in evidence of record. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Schroeder v. Barth, Inc.,* 969 F.2d 421, 423 (7th Cir.1992). If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present specific facts which show that a genuine issue exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). The opposing party, however, must do more than create a mere "colorable" factual dispute to defeat summary judgment; disputed facts must be material— i.e., outcome determinative. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Schroeder,* 969 F.2d at 423; *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party, and must resolve any doubt against the moving party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992); *Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland, Ltd.,* 969 F.2d 329, 331–32 (7th Cir.1992). If a reasonable fact-finder could find for the opposing party, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992). If the standards of Rule 56(c) are not met, however, summary judgment becomes mandatory. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 248–50, 106 S.Ct. at 2510–11; *Shields Enterprises,* 975 F.2d at 1294. Summary judgment is not a disfavored procedural shortcut; rather, it is an integral part of the federal rules, which are designed to secure the just and expeditious determination of every action. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554–55; *see United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267–68

(7th Cir.1990), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, ——, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993) (brackets in original) (*quoting Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). In such a situation there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (*quoting* Fed. R.Civ.P. 56(c)).

### A. THE RALLY DEFENDANTS

In the First Amended Complaint ("Complaint"), the Plaintiffs alleged that the Rally Defendants fraudulently induced the Plaintiffs to invest; violated §§ 12(1) and 12(2) of the Securities Act of 1933; violated § 10(b) of the Securities Act of 1934 and Rule 10b–5; and violated federal RICO. The Rally Defendants filed a motion for summary judgment on all counts on November 4, 1994. The Plaintiffs responded with their own cross motion for summary judgment, filed April 17, 1995. Based upon these motions and the accompanying briefs, Plaintiffs have only shown genuine questions of material fact with respect to one issue: whether any of the Rally Defendants sold unregistered securities in violation of Section 12(1) of the 1933 Securities Act. 15 U.S.C. § 77l(1) (1988). Accordingly, summary judgment is granted in favor of the Rally Defendants on all other issues.

### 1. FRAUDULENT INDUCEMENT TO INVEST

■ In Count I of the Complaint, Plaintiffs allege that the Rally Defendants fraudulently induced them to invest.[3] Under

---

**3.** While Plaintiffs have labelled Count I of their complaint "Fraudulent Inducement to Invest," this first count also alleges that the Defendants violated sections 12(1) and 12(2) of the Securities Act of 1933. To clarify the discussion of Count I, the securities issues will be discussed in Part A.2.

Indiana law,[4] fraud may be actual or constructive. *Coffey v. Wininger,* 156 Ind.App. 233, 296 N.E.2d 154, 159 (1973). It is unclear from Plaintiffs' Complaint and briefs whether they claim the Rally Defendants committed actual or constructive fraud; however, the Plaintiffs have failed to raise a genuine issue of material fact under either theory. Therefore, summary judgment in Defendants' favor on this issue is appropriate.

■ To prevail in an actual fraud claim under Indiana law, the plaintiff must prove the following elements: "(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of." *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind.1992); *see also Schwartz v. Oberweis,* 826 F.Supp. 280, 288 (N.D.Ind.1993). Indiana courts require an actionable misrepresentation to be "of past or existing fact." *Schwartz,* 826 F.Supp. at 288 (quoting *Smith v. Colgate–Palmolive Co.,* 752 F.Supp. 273, 278 (S.D.Ind.1990), *aff'd* 943 F.2d 764 (7th Cir.1991)). Indiana law is well-settled that actual fraud may not be based on representations regarding future conduct, or on broken promises, unfulfilled predictions or statements of existing intent which are not executed. *Biberstine v. New York Blower Co.,* 625 N.E.2d 1308, 1315 (Ind.Ct.App.1993). Also, to have the force and effect of a fraudulent misrepresentation, a representation must be unqualified. *Bischoff Realty, Inc. v. Ledford,* 562 N.E.2d 1321, 1324 (Ind.Ct.App. 1990).

■ The Plaintiffs have failed to point to any misrepresentations by any of these three defendants to support a claim for actual fraud. The Rally Defendants have consistently stated that they never had any direct personal contact or written communication with any of the Plaintiffs. The Plaintiffs have not disputed this position, nor have they provided this Court with any evidence to the contrary. Furthermore, Plaintiffs' brief does not list any misrepresentations made to them by these three Defendants, and no appropriate evidentiary material has been designated.

Plaintiffs appear to rely on the May 20, 1991, Letter of Intent as evidence of misrepresentations by the Rally Defendants. This reliance is misplaced. While Garcia did sign this letter, both individually and on behalf of Rally Group and Rally Ventures, the Letter was addressed to Prime Corporation—not to Jeannette Lycan, Millard Pauley, or Gray Farms, Inc. Simply stated, Plaintiffs cannot premise their fraud claim on statements that were not made to them.

■ More importantly, Plaintiffs have failed to show that any statement in the Letter of Intent qualifies as an actionable misrepresentation. Under Indiana law, an individual must make a misrepresentation of past or existing fact to be liable for fraud. The Letter of Intent, by its very nature, addresses intentions and future actions—not past or existing facts. For example, the first paragraph of the Letter discusses the parties' "intention to acquire a controlling interest in the issued and outstanding shares of Prime Corporation." Such language does not support a fraud claim.

In addition, the Letter contains numerous conditions. For example, the Letter states: "The transactions contemplated herein are subject to the final approval of the federal Bankruptcy Court." Lycan Aff., Ex. 55, p. 88. The Letter also requires Brownsing, Norman Reinbold, and Warren Spangle to provide personal guarantees for $250,000.00 each. Lycan Aff., Ex. 55, p. 91. Under Indiana law, a statement must be unqualified to constitute a misrepresentation; because it contains several conditions, the May 20, 1991 Letter of Intent simply does not support the Plaintiffs' allegations of fraud.

The Plaintiffs assert that Garcia employed Collins as an agent and that the Rally Defendants are therefore liable for any misrepresentations by Collins. Plaintiffs' brief refers

---

**4.** The parties all agree that, to the extent the Plaintiffs' claims are governed by state law, Indiana law applies.

to Collins as "a trusted confidante of Garcia" and allege that Walters "conspired with Collins to induce Garcia to participate in the scheme...." Pls.Consolidated Br., p. 9. Plaintiffs also state that "Collins acted as Garcia's agent in dealing Rally Ventures shares to Walters/Brownsing for the Prime/Rally merger, and [Garcia] paid Collins a finders' fee of $5,125.00 for 'finding' Plaintiffs as investors to the transaction." Pls.Consolidated Br., p. 11. Plaintiffs offer no evidence in the form of depositions, letters or affidavits to support their assertion that Collins was Garcia's agent; instead, they point to four checks written by Garcia to Collins. Pls.Statement (Rally Defendants), Ex. 5, pp. 8–9.

■ However, the mere passage of funds evinced by the four checks fails to illustrate any "genuine issue" concerning the existence of an agency relationship. Plaintiffs seem to contend that payment of a finders' fee, without more, creates an agency relationship, but they offer no legal support for this contention. This Court's research has revealed no cases where this type of payments has been held to establish such a relationship.

Plaintiffs' own exhibits undermine their assertion that Collins acted as Garcia's agent. In a letter sent to Walters and Wayne Lycan, Collins states that his company, New Image, "has been contracted to act in the capacity as the Financial PR firm for Prime Corporation." Pls.Statement (Rally Defendants), Ex. 3, p. 3. This letter shows that Collins served as an agent to Prime Corporation—not the Rally Defendants. In short, Plaintiffs have failed to support their allegation of an agency relationship with evidence sufficient to illustrate a genuine issue of material fact.

■ The Plaintiffs also fail to raise any genuine issue in a claim of constructive fraud. Indiana courts define constructive fraud as acts from which a defendant derives an unconscionable advantage; a breach of confidence coupled with an unjust enrichment which shocks the conscience; a breach of duty which the law declares fraudulent because of a tendency to deceive, injure the public interest, or violate public or private confidence; or the making of a false statement in the context of a confidential relation-

ship. *Abdulrahim v. Gene B. Glick Co., Inc.,* 612 F.Supp. 256, 263 (N.D.Ind.1985). The elements of a constructive fraud claim are "1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate cause thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Biberstine,* 625 N.E.2d at 1315–16; *Schwartz,* 826 F.Supp. at 286. Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Biberstine,* 625 N.E.2d at 1315.

■ In the present case, the Plaintiffs have failed to raise any genuine issue of material fact concerning the existence of a duty. Generally, a duty arises when there is a confidential relationship, such as a blood, marital, or fiduciary relationship. *Grow v. Indiana Retired Teachers Community,* 149 Ind.App. 109, 271 N.E.2d 140, 143 (1971). For a confidential relationship to exist, it is essential that there be a dominant and a subordinate party, and it must be established by the facts that the alleged subordinate party was justified in relying upon a relationship of trust and confidence. *Id.* In effect, the law infers constructive fraud from the relationship of the parties and the circumstances that surround them; the special relationship is shown when the parties have fiduciary duties to each other, such as in the relationship between lawyer and client. *Comfax Corp. v. North Am. Van Lines,* 587 N.E.2d 118, 125 (Ind.Ct.App.1992).

No special relationship can be said to exist between the Plaintiffs and any of these three moving Defendants. At most, the Rally Defendants were involved in an investment transaction with the Plaintiffs. Since Plaintiffs have offered no evidence suggesting a confidential or fiduciary relationship existed, they cannot prevail under a constructive fraud theory, and Defendants are entitled to summary judgment.

## 2. VIOLATIONS OF §§ 12(1) AND 12(2) OF THE SECURITIES ACT OF 1933

As a second theory of liability in Count I of the Complaint, Plaintiffs assert that the Rally Defendants violated §§ 12(1) and 12(2) of the Securities Act of 1933. Essentially, Plaintiffs contend that these Defendants sold them shares of Prime Corporation, options to purchase Rally shares, and Rally shares which were not registered with the SEC.

 Plaintiffs have not raised a genuine issue of material fact with respect to whether any of these defendants violated § 12(2). This section provides that a person commits a violation if he offers or sells a security:

> by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. . . .

15 U.S.C. § 77l (2) (1988). To prevail, a plaintiff in a § 12(2) action must be able to identify affirmative statements that were misleading at the time a document—such as a prospectus—becomes effective or statements that became misleading by material omission. *In re Bank of Boston Corp. Sec. Litig.*, 762 F.Supp. 1525, 1538 (D.Mass.1991). Stated simply, Plaintiffs have failed to do so. As previously noted, the Plaintiffs have not specifically identified any untrue statement of material fact or any material fact omitted by any of these Defendants. Therefore, Defendants are entitled to summary judgment regarding this issue.

**5.** Section 10(b) provides as follows:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or decep-

 Plaintiff's claim under § 12(1) (15 U.S.C. § 77l (1) (1988)) presents issues more difficult to resolve at this stage of the litigation. Section 12(1) imposes "what amounts to strict liability for a violation of section 5 through the use of the mails or interstate commerce to sell an unregistered security." *Raiford v. Buslease, Inc.*, 825 F.2d 351, 354 (11th Cir.1987). To establish a prima facie case of violation of section 5, a plaintiff need allege only the sale or offer to sell securities, the absence of a registration statement covering the securities, and the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Id.; Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir. 1980).

 Whether any of the Rally Defendants violated § 12(1) cannot be resolved through summary judgment at this time. Based upon the briefs and the designated evidentiary material, it is unclear which shares—if any—were "sold"; who was the "seller"; who was the purchaser; whether the shares were required to be registered with the Securities Exchange Commission; or whether the shares were, in fact, registered. These questions may be capable of resolution on summary judgment; however, neither side has demonstrated the absence of a genuine issue of material fact. Therefore, the Defendants' motion for summary judgment on this issue and the Plaintiffs' motion must both be denied.

## 3. VIOLATIONS OF § 10(b) OF THE SECURITIES ACT OF 1934 AND RULE 10b–5

In Count II of the Complaint Plaintiffs allege that the Rally Defendants committed violations of § 10(b) of the Securities Act of 1934[5] and Rule 10b–5;[6] To survive Defen-

tive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j (1988).

**6.** Rule 10b–5 provides as follows:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the

dants' motion for summary judgment as to this count of the Complaint, the Plaintiffs must show that some genuine issue of material fact exists with respect to these issues.

Previously, a plaintiff could have prevailed in a § 10(b) or 10b–5 claim by showing that a defendant aided or abetted another in committing a securities violation. *See, e.g., Ackerman v. Schwartz,* 947 F.2d 841 (7th Cir. 1991); *Barker v. Henderson, Franklin, Starnes, & Holt,* 797 F.2d 490 (7th Cir.1986). However, that result changed with the Supreme Court's decision in *Central Bank v. First Interstate Bank,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Because the text of § 10(b) does not prohibit aiding and abetting, the Court held that a private plaintiff may not maintain an aiding and abetting suit under § 10(b) or Rule 10b–5. *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1455. Accordingly, the Plaintiffs must show that the Rally Defendants committed substantive violations of § 10(b) or Rule 10b–5 to prevail in their claim;[7] more specifically, to survive the motion for summary judgment, the Plaintiffs must show a genuine issue of material fact exists with respect to whether any of the Rally Defendants violated either the rule or the statute. As the discussion below will illustrate, the Plaintiffs have failed to establish any genuine issue under either theory; therefore, summary judgment in Defendants' favor is appropriate.

The practical and legal obstacles to bringing a private § 10(b) action are significant; a § 10(b) plaintiff must prove elements that are similar to those in actions for common-law fraud. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 376, 111 S.Ct. 2773, 2789, 115 L.Ed.2d 321 (1990) (Kennedy, J., dissenting). To prevail in a claim under this section, a private plaintiff must prove that the defendant made a false or misleading statement or a material omission;[8] that the plaintiffs relied upon this statement or omission;[9] that the plaintiffs sustained damages as a result;[10] and that the defendant acted with scienter.[11] *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994) (listing these four elements as nec-

---

mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1992).

**7.** As the Court stated:

The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under Rule 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* (emphasis in original).

**8.** *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 376, 111 S.Ct. 2773, 2789, 115 L.Ed.2d 321 (1990) (Kennedy, J., dis-

senting); *Santa Fe Indus. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

**9.** *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) ("We agree that reliance is an element of a Rule 10b–5 cause of action.... Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury.").

**10.** *Associated Randall Bank v. Griffin, Kubik,* 3 F.3d 208, 213 (7th Cir.1993) ("Sometimes this principle comes under the name 'loss causation': the plaintiff must establish that the misrepresentation caused him to incur the loss of which he complains; it is not enough to establish that the misrepresentation caused him to buy or sell the securities."); *see also Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

**11.** *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 ("When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct.").

essary to a § 10(b) claim); *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992) (same); *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989) (same); *Hoffman v. Szyszko*, 1994 WL 721569, *2 (N.D.Ill.) (same); *Peregrine Options, Inc. v. Farley, Inc.*, 1993 WL 489739, *9 (N.D.Ill.) (same). For a violation of § 10(b) to be based upon an omission, the plaintiff must show that the defendant owed some sort of duty, for "there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). The Plaintiff must prove these elements by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691–92, 74 L.Ed.2d 548 (1983).

▬▬▬ The elements of a 10b–5 claim are extremely similar to the elements of a § 10(b) claim. In general, to prevail on a Rule 10b–5 claim, a plaintiff must prove that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plaintiff's injury. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). As with § 10(b), mere silence about even material information is not fraudulent absent a duty to speak. *Id.; Chiarella*, 445 U.S. at 235, 100 S.Ct. at 1118.

▬▬▬ The Plaintiffs have not raised any genuine issue of material fact concerning whether or not they relied on any misrepresentation of any of these defendants. As noted with respect to the fraud claim, Plaintiffs have not pointed to a single misrepresentation by the Rally Defendants. More-over, since the Plaintiffs have not provided any evidence of a duty owed them by the Rally Defendants, no omission by these Defendants would be actionable under § 10(b) or Rule 10b–5. Since the Plaintiffs have not identified material misrepresentation or omission, they have not shown an element crucial to their § 10(b) and Rule 10b–5 claim.

▬▬▬ Additionally, the Plaintiffs have not identified any evidence suggesting they relied upon any information or omission from these Defendants. The Plaintiffs never communicated directly with any of the Rally Defendants—which makes proof of reliance especially difficult. In their briefs, Plaintiffs include conclusory statements that they relied; however, they fail to support these statements with citations to evidence. Without any identified misrepresentations or omissions or any evidence of reliance, Plaintiffs cannot withstand Defendants' motion for summary judgment on this issue.[12]

▬▬▬ As noted by the Supreme Court, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1116–17 (1980). Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. *Id.* at 234–35, 100 S.Ct. at 1117–18. Here, the Plaintiffs have failed to provide any evidence that the Rally Defendants committed actions rising to the level of fraudulent activity under the statute or under the rule. Therefore, these Defendants' motion for summary judgment is granted as to Count II.

### 4. VIOLATIONS OF FEDERAL RICO

In Count V of the Complaint, Plaintiffs contend that Garcia violated the federal

---

12. Instead of identifying misrepresentations or establishing reliance, Plaintiffs assert that the Rally Defendants played a substantial part in a scheme to defraud them. To this end, the Plaintiffs note that "[l]iability under 10b–5 may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration. For example, ... 'a lawyer has no privilege to assist in circulating a statement with regard to securities which he knows to be false simply because his client has furnished it to him.'" *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994) (*quoting SEC v. Frank*, 388 F.2d 486, 489 (2d Cir.1968)). The decision in *Azrielli* not only originates in a different circuit but also predates the Supreme Court's pronouncements that a private plaintiff may not maintain an aiding and abetting suit under § 10(b) and that secondary actors in the securities market will not be liable under § 10(b) or 10b–5 unless all requirements for primary liability are met. *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1455. Since Plaintiffs have failed to establish the required elements of their § 10(b) and 10b–5 claims, they cannot survive the Defendants' motions for summary judgment by asserting that the Defendants assisted in the perpetration of a fraud.

RICO statute. However, Garcia did not commit a "pattern of racketeering activity" as defined by the Act and subsequent judicial development. Therefore, summary judgment shall be granted in Garcia's favor on this count of the Complaint.

 Plaintiffs assert that Garcia violated 18 U.S.C. § 1962(c) (1988), which provides in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1961(5) defines "pattern of racketeering activity" as "at least two acts of racketeering activity...."[13] However, this statutory language does not offer a comprehensive definition of the pattern requirement. While two acts are necessary, they may not be sufficient to form a pattern. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *id.* at 527, 105 S.Ct. at 3289 (Powell, J. dissenting). The Supreme Court has held that a RICO pattern requires that the racketeering activities exhibit the factor of continuity plus relationship. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989). If the alleged racketeering activities either are unrelated or do not exhibit continuity, there is no RICO pattern. *See id.* ("a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose the threat of continued criminal activity.") (emphasis in original).

 Racketeering activities are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (*quoting* 18 U.S.C. § 3575(e) (1988)). Continuity is "centrally a temporal concept...." *Id.* at 242, 109 S.Ct. at 2902.

A pattern of racketeering activity may be closed-ended—referring to a closed period of repeated conduct over a substantial period of time—or open-ended—referring to conduct which "projects into the future with a threat of repetition." *Id.* at 241–42, 109 S.Ct. at 2902.

 The Supreme Court has not established any clear-cut test or specific formula for determining if the specific facts of a case evince the necessary continuity. *J.D. Marshall Int'l v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir.1991). Consequently, the Seventh Circuit employs a multi-factor test to determine whether a threat of continuing racketeering activity exists. The court considers "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.* (*quoting Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986)). The length of time is one especially significant factor in this analysis since "Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. As noted by the Supreme Court: "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related practices extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* A single scheme which lasts only a short period does not have the requisite continuity, even if there are multiple predicate acts and victims. *Miller v. Gain Fin., Inc.*, 995 F.2d 706, 709 (7th Cir. 1993).

Several recent Seventh Circuit opinions have examined the timing question. In *McDonald v. Schencker*, 18 F.3d 491, 497–98 (7th Cir.1994), for example, the facts of the case involved one general scheme, one victim, three acts, and a time period of, at most, two months; the court held that this did not satisfy the continuity requirement. In *Miller*, 995 F.2d at 708–09, the court concluded that a claim involving a single scheme over a

---

13. Racketeering activity is defined by the statute as any one of a number of specified state and federal violations, including mail fraud, wire fraud, and fraud in the sale of securities.

period of a few months did not show continuity. In *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 922 (7th Cir.1992), the court found that a single scheme lasting only seven to eight months was "precisely the sort of short-term, closed-ended fraud that, subsequent to *H.J.*, this circuit consistently has held does not constitute a pattern."

 In the present case, the Plaintiffs cannot prevail in their RICO claim since the facts do not show the requisite continuity.[14] Plaintiffs allege that the Rally Defendants committed several RICO predicates over a period approximately six months in length. Garcia became involved in the underlying transactions in early 1991, and he sent a letter withdrawing from the business relationship with Prime Corporation in September 1991. The acts involved three victims and were part of a single scheme with a natural ending point. In addition, Plaintiffs have not shown any danger that these Defendants' acts project into the future with a threat of repetition. Under current precedent, the brief time period encompassing the transactions at issue does not satisfy the continuity requirement. In fact, it is precisely the sort of closed-ended, short-term activity which "this circuit consistently has held

does not constitute a pattern." *Uni\*Quality*, 974 F.2d at 922. Since Plaintiffs cannot satisfy the continuity requirement, no "pattern" exists under RICO. Therefore, Garcia is entitled to summary judgment on Count V of Plaintiffs' Complaint.

### B. DEFENDANTS BROWN/S & I

 In the Complaint, Plaintiffs raised four claims against Defendants Brown/S & I. Plaintiffs contended that Brown/S & I fraudulently induced them to invest; violated §§ 12(1) and 12(2) of the Securities Act of 1933; violated § 10(b) of the Securities Act of 1934 and Rule 10b–5; and committed negligence and breached their contract with the Plaintiffs.[15] On January 5, 1993, Brown/S & I filed a 12(b)(6) motion on Count III of the Complaint (relating to negligence and breach of contract). This motion was granted on October 5, 1993; therefore, only two counts of the complaint remain.[16] On January 4, 1995, Brown/S & I filed a motion for summary judgment concerning these two counts. On April 17, 1995, Plaintiffs responded with their own motion for summary judgment against Brown/S & I. For reasons to be set forth below, summary judgment is granted in

14. In fact, two other Defendants in this matter, Brownsing and Walters, filed a 12(c) Motion for Judgment on the Pleadings on this Count of the complaint, which this Court granted, stating: "Because the scope of the alleged conspiracy was limited to predicate acts which were part of a single, closed-ended scheme of limited duration, the conspiracy did not include a pattern of racketeering activity." Order on Motion for Judgment on the Pleadings, September 24, 1993, p. 9.

15. In their various briefs relating to these motions for summary judgment, the Plaintiffs also seem to suggest that Brown committed the tort of negligent misrepresentation, an issue which was not raised in the Amended Complaint. Ignoring the procedural question of whether Plaintiffs may assert such a claim for the first time in a brief opposing a motion for summary judgment, this claim lacks merit. The parties all agree that Indiana law governs in this case, and as a general matter, "Indiana does not recognize the tort of negligent misrepresentation." *Pugh's IGA, Inc. v. Super Food Svcs., Inc.*, 531 N.E.2d 1194, 1199 n. 1 (Ind.Ct.App.1988); *Smith v. Colgate–Palmolive Co.*, 752 F.Supp. 273, 278 (S.D.Ind.1990).

Indiana's court of appeals has allowed a limited exception to this rule for an employee's suit

against his employer. *See Eby v. York–Division, Borg Warner*, 455 N.E.2d 623 (Ind.Ct.App.1983). However, "Indiana courts have consistently refused to extend the tort of negligent misrepresentation beyond the employment context." *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 721 (7th Cir.1994). More directly, "Indiana has declined to recognize the tort of negligent misrepresentation in the context of rendering professional opinions." *Emmons v. Brown*, 600 N.E.2d 133, 135 (Ind.Ct. App.1992). This body of law prevents the Plaintiffs from prevailing in a negligent misrepresentation claim against Brown/S & I—even if the proper procedures had been followed in raising that claim.

16. In the October 5, 1993, ruling, this Court referred to "attorney malpractice" without specifically mentioning the elements of a contract implied at law. However, the Plaintiffs' failure to allege facts supporting an inference that Brown or S & I consented to an attorney/client relationship was fatal to the contract claim as well as the negligence claim. Therefore, this Court concludes that the whole of Count III was dismissed under the order dated October 5, 1993.

favor of Brown/S & I on Counts I and II of the Complaint.

## 1. FRAUDULENT INDUCEMENT TO INVEST

In Count I of the Complaint, the Plaintiffs assert that Brown/S & I fraudulently induced them to invest in Prime Corporation. However, the Plaintiffs have failed to establish any genuine issue of fact concerning the reliance element of this claim. Therefore, summary judgment for Brown/S & I is appropriate on this issue.

■■■■ Once again, the Plaintiffs have not specified whether they base their fraud claim upon a theory of actual fraud or constructive fraud. The elements of each theory have been stated in the section discussing the Rally Defendants. Under either theory, reliance is a key element. *Lawyers Title Ins. Corp.*, 595 N.E.2d at 249; *Schwartz*, 826 F.Supp. at 286. Indiana law requires reliance on an alleged misrepresentation to be reasonable. *McWaters v. Parker*, 995 F.2d 1366, 1372 (7th Cir.1993). To demonstrate reasonable reliance, the plaintiff must show not only that he in fact relied on the misrepresentations, but also that he had a right to rely on them. *Id.* Reliance consists of two parts: the fact of reliance and the right of reliance. *Puller Mortg. Assocs., Inc. v. Keegan*, 829 F.Supp. 1507, 1521 (S.D.Ind.1993). The fact of reliance is simply that a plaintiff relied on a misstatement; compared to the right of reliance this fact is "by far the easier to determine." *Id.* (*quoting Plymale v. Upright*, 419 N.E.2d 756, 761 (Ind.Ct.App. 1981)). The right of reliance is less easily established:

> The right of reliance is more difficult to determine for the reason it is tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. In the course of daily interaction and business dealing the average person encounters a barrage of opinions, advice, advertisements, estimates, and even "guestimates." He simply cannot believe, or rely

upon, everything he is told. "The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and sagacity enable them to protect themselves." ... However, it is also established that where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment.

*Plymale*, 419 N.E.2d at 762 (citations omitted).

■■■■ In the present case, the Plaintiffs have not indicated any genuine issue of material fact concerning the element of reliance. While Plaintiffs have asserted that they relied upon Brown, they have neither identified a specific statement or omitted fact upon which they relied nor provided facts indicating how such reliance manifested itself. Unsupported assertions simply do not establish genuine issues for the purpose of summary judgment analysis.

■■■■ More importantly, the Plaintiffs have failed to establish that they had any right to rely upon Brown's statements. This Court has already dismissed the Plaintiffs' attorney malpractice claim, finding that the Complaint failed to allege facts establishing that Brown/S & I consented to formation of an attorney-client relationship. Accordingly, no fiduciary relationship can be said to exist between Jeannette Lycan, Gray Farms, and Millard Pauley on the one hand and Brown/S & I on the other. Similarly, there is no allegation that the Plaintiffs did not stand on equal footing mentally with Brown/S & I. Ultimately, the facts of this case present a situation where the Plaintiffs had the duty "to be diligent in safeguarding [their] interests." Their failure to do so does not create a legally cognizable injury. Therefore, Defendants' motion for summary judgment as to this aspect of Count I of the Complaint is granted.

## 2. VIOLATIONS OF §§ 12(1) AND 12(2) OF THE SECURITIES ACT OF 1933

■■■■ In Count I, Plaintiffs also allege that Brown/S & I violated various provisions of

the Securities Act of 1933. More specifically, Plaintiffs assert that the Defendants "substantially assisted" certain other defendants in violating §§ 12(1) and 12(2) of the Act. However, this contention cannot succeed since there is no vicarious liability under these sections of the Securities Act. Therefore, summary judgment in favor of Brown/S & I is appropriate on this issue.

■ Although § 12 reaches "sellers" who do not stand in privity with a purchaser, the section does not reach persons such as attorneys who facilitate a sale but are not statutory "sellers." *Pinter v. Dahl*, 486 U.S. 622, 641–54, 108 S.Ct. 2063, 2075–82, 100 L.Ed.2d 658 (1988). Recently, the Seventh Circuit specifically held "that there is no liability for aiding or abetting a violation of § 12." *Ackerman*, 947 F.2d at 845; *see also Barker*, 797 F.2d 490.

■ The Plaintiffs have not raised any genuine issue of fact concerning whether Brown or S & I committed a substantive violation of § 12. Indeed, the Plaintiffs have never contended that Brown or S & I were sellers or that they sold securities in violation of § 12(1) or § 12(2). Rather, the Plaintiffs have asserted that Brown substantially assisted certain primary violators in such a sale. Under federal law, Brown cannot be liable for providing such assistance, regardless of whether any of the other Defendants in this action sold securities in violation of either section. Therefore, summary judgment in favor of Brown/S & I is granted on this issue.

### 3. VIOLATIONS OF § 10(b) OF THE SECURITIES ACT OF 1934 AND RULE 10b–5

In Count II of the Complaint, the Plaintiffs allege that Brown/S & I violated § 10(b) of the Securities Act of 1934 and Rule 10b–5. The necessary elements under the statute and the rule have been stated in the section discussing the Rally Defendants. The Plaintiffs may not prevail by showing Brown/S & I aided and abetted a violation but must instead show that Brown/S & I themselves committed a substantive violation of the statute or rule. *See Central Bank*, — U.S. at —, 114 S.Ct. at 1455.

■ In the present case, Plaintiffs initially contended that Brown/S & I were liable as aiders and abettors but now assert that Brown/S & I substantively violated § 10(b) and Rule 10b–5. However, they have failed to support this allegation with facts sufficient to survive Defendants' motion for summary judgment on this issue. Specifically, the Plaintiffs have not identified any actionable misrepresentation or omission by Brown or S & I or any evidence of their own reliance.

■ To a large extent, the Plaintiffs have based their § 10(b) and 10b–5 claims against Brown/S & I on an omission theory. The Plaintiffs contend that Brown violated the statute and rule by failing to give them certain information about Prime Corporation.[17] For an omission to violate § 10(b) or Rule 10b–5, the defendant must have a duty to speak. As stated by the Seventh Circuit: "When the nature of the offense is a failure to 'blow the whistle,' the defendant must have a *duty* to blow the whistle. And this duty does not come from 10(b) or Rule 10b–5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law." *Barker*, 797 F.2d at 496 (emphasis in original).

This Court has already determined that no attorney-client relationship existed between Brown and the Plaintiffs. Brown acted as counsel to Prime Corporation—not the Plaintiffs. Lawyers are not required to tattle on their clients absent some duty to disclose; rather, attorneys have privileges not to disclose. *Id.* at 497. The Plaintiffs have offered no evidence suggesting that Brown owed them any duty to disclose. Without such a duty, any omission by Brown would not support a claim under 10b–5 or § 10(b).

To a lesser extent, the Plaintiffs have contended that Brown made material misrepresentations to them. However, they have

---

17. In Paragraphs 51–59 of the Complaint, the Plaintiffs specifically list the facts they allege Brown failed to disclose to them. This Court paraphrased these alleged omissions in its order of October 5, 1993, granting Brown/S & I's motion to dismiss Plaintiffs' attorney malpractice claim.

failed to provide this Court with evidence to support this contention. The briefs and supporting materials identify few statements made by Brown to the Plaintiffs. Brown's affidavit asserts that each statement he made to the Plaintiffs was true, and the Plaintiffs have not designated any evidence to the contrary.[18] Moreover, the Plaintiffs have failed identify evidence suggesting that any statement by Brown—whether true or false—was material to their investment decision. Simply stated, the Plaintiffs have provided no evidence that Brown made a material misrepresentation or actionable omission; therefore, summary judgment in favor of Brown/S & I is appropriate on the § 10(b) and 10b–5 claims.

▉ In addition, the Plaintiffs have not satisfied the reliance requirement. A plaintiff in a 10b–5 action must prove that he relied on the defendant's misrepresentation in order to recover damages. *See Basic Inc.,* 485 U.S. at 243, 108 S.Ct. at 989–90. Reliance is an element of a Rule 10b–5 cause of action, for reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury. *Id.* Where misrepresentations are made but are not relied upon directly or indirectly, the plaintiff cannot show he was harmed by them. *Latigo Ventures v. Laventhol & Horwath,* 876 F.2d 1322, 1326 (7th Cir.1989). Allowing plaintiffs to circumvent this reliance

requirement would disregard the careful limits on 10b–5 recovery mandated by the Supreme Court's line of cases interpreting the Rule. *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1450.

▉ As noted with respect to the Plaintiffs' claim that Brown/S & I fraudulently induced them to invest, the Plaintiffs have not identified any facts suggesting that they based their decision to invest on statements by Brown. Moreover, the Plaintiffs have provided no facts indicating that such reliance would have been justifiable or reasonable.[19] Since they have not designated any facts to show reliance, the Plaintiffs have failed to show they were harmed by any statements or omissions by Brown and summary judgment is appropriate. Therefore, summary judgment is granted in favor of Brown/S & I on Count II of the Complaint.

### C. DEFENDANTS MADDOX/C & S

In the Complaint, Plaintiffs raised four claims against Defendants Maddox/C & S. Plaintiffs contended that Maddox/C & S fraudulently induced them to invest; violated §§ 12(1) and 12(2) of the Securities Act of 1933; violated § 10(b) of the Securities Act of 1934 and Rule 10b–5; and committed negligence and breached their contract with the Plaintiffs.[20] On November 25, 1992, Mad-

---

**18.** One statement by Brown does warrant particular attention. The Plaintiffs contend that Brown stated to Steve Lycan and Gray that the bankruptcy was ninety-five per cent complete and that there was no problem at all with finishing it up. Lycan Aff., ¶ 19, p. 4. This statement comes precariously close to presenting a genuine issue of material fact. However, Brown/S & I have submitted documentary evidence that the bankruptcy proceedings were in fact nearly complete. While Plaintiffs have argued that Brown should have known that the Prime Battery assets would never be recovered from bankruptcy, they have not submitted or designated any evidentiary materials suggesting that any genuine issue exists. As a result, this statement does not allow the Plaintiffs to survive Brown/S & I's motion for summary judgment on this Count of the Complaint.

**19.** The Seventh Circuit "ascribe[s] no magic powers to the *word* 'reliance.'" *Latigo Ventures,* 876 F.2d at 1326. Nonetheless, it is interesting to note that several circuits do examine whether a plaintiff's reliance upon a defendant's misstatement/omission was "reasonable" or "justifiable." *See, e.g., Kowal v. MCI Communications Corp.,* 16 F.3d 1271 (D.C.Cir.1994); *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256 (4th Cir.1993); *Schlessinger v. Herzog,* 2 F.3d 135 (5th Cir.1993); *Wright v. National Warranty Co.,* 953 F.2d 256 (6th Cir.1992). In the present case, however, the Plaintiffs have not identified any facts showing they relied upon the Defendants' statements, so whether their reliance was "reasonable" is not outcome determinative.

**20.** Just as the Plaintiffs seemed to suggest in their briefs that Brown committed negligent misrepresentation, so they suggest that Maddox committed the same tort. Just as that contention lacked merit in reference to Brown, so it lacks merit against Maddox since, generally, "Indiana does not recognize the tort of negligent misrepresentation." *Pugh's IGA, Inc.,* 531 N.E.2d at 1199 n. 1; *Smith,* 752 F.Supp. at 278. For further discussion of negligent misrepresentation under Indiana law, see *supra* note 14.

dox/C & S filed a motion to dismiss the complaint based upon Rules 12(b)(6) and 9(b); on October 5, 1993, this Court granted the motion with respect to Count I of the complaint—relating to fraudulent inducement to invest—but not with respect to the remaining counts. On January 3, 1995, Maddox/C & S filed a motion for summary judgment concerning Counts II and IV. On April 17, 1995, Plaintiffs responded by moving for summary judgment against Maddox/C & S. For reasons to be set forth below, summary judgment is granted in favor of Maddox/C & S on Counts II and IV of the Complaint.

## 1. VIOLATIONS OF §§ 12(1) AND 12(2) OF THE SECURITIES ACT OF 1933

In granting the Maddox/C & S's motion to dismiss Count I, this Court did not discuss whether or not either Defendant violated §§ 12(1) or 12(2) of the Securities Act of 1933; therefore, these aspects of Count I still remain. While Maddox/C & S did not request summary judgment on these issues in their present motion, summary resolution is appropriate. Like the § 12 claims against Brown/S & I, Plaintiffs' § 12 claims against Maddox/C & S are premised on a theory that Maddox/C & S substantially assisted other Defendants in violating the statute. However, as recently noted by the Seventh Circuit, "there is no liability for aiding or abetting a violation of § 12." *Ackerman,* 947 F.2d at 845. Therefore, summary judgment is granted in favor of Maddox/C & S on this issue.

## 2. NEGLIGENCE AND BREACH OF CONTRACT

Turning first to Count IV of the Complaint, Plaintiffs contend that Maddox's conduct created an attorney-client relationship between him and the Plaintiffs. They assert that Maddox breached his duty to them by failing to exercise reasonable care on their behalf and that he breached his agreement with them by failing to provide effective counsel.

Under Indiana law, the essential elements of a cause of action for legal malpractice are as follows: (1) the employment of the attorney (the duty); (2) the attorney's failure to exercise ordinary skill and knowl-edge (the breach); (3) negligence which was the proximate cause (causation); and (4) damage to the plaintiff (damages). *Rice v. Strunk,* 632 N.E.2d 1151, 1154 (Ind.Ct.App. 1994); *see also Jones v. Psimos,* 882 F.2d 1277, 1281 (7th Cir.1989) (applying Indiana law), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Hacker v. Holland,* 570 N.E.2d 951, 954 (Ind.Ct.App. 1991) *reh'g denied,* 575 N.E.2d 675. An attorney-client relationship need not be expressly created but may instead be implied from the conduct of the parties. *Hacker,* 570 N.E.2d at 955. A would-be client's unilateral belief cannot create an attorney-client relationship; rather, the relationship is consensual and only exists after both attorney and client have consented to its formation. *Id.* An attorney has effectively consented to an attorney-client relationship if a person seeking legal services reasonably relies on an attorney to provide services and the attorney, aware of such reliance, does nothing to negate it. *Id.* at 956.

To determine whether an attorney client relationship sprang into being in the present case, this Court must examine the beliefs of both Maddox and the Plaintiffs. Maddox himself has consistently contended that he did not consent to the formation of such a relationship. In his deposition, Maddox was asked whether he believed such a relationship had been formed:

Q: All right. Did, at any time, you ever consider yourself to be attorney for the Lycans?

A: Not only did I not consider myself to be an attorney for the Lycans, I specifically told them that I was special securities counsel to Prime Corporation, almost every time I met with them. And I specifically suggested to them that they find their own outside counsel because I was only representing the interest of the corporation.

Maddox Dep., p. 169–70. Maddox also discussed whether he had provided legal advice to the Plaintiffs:

A: I did not give them legal advice. I specifically told them I was special securities counsel to Prime Corporation, and

strongly suggested that they find their own outside counsel, which Wayne Lycan refused to do.

Q: He made the remark that the attorneys he knew in Illinois wouldn't know anything about this?

A: They wouldn't know anything about it more than he would. That is what he said.

And I said, "I can refer you to someone here in Indianapolis or over in Illinois, who I know have done some securities work."

And he rejected that.

Maddox Dep., p. 173. These remarks show that Maddox did not knowingly give actual consent to the formation of an attorney-client relationship. Therefore, the question becomes whether or not Maddox effectively consented to formation of the relationship by allowing Plaintiffs to rely upon him.

 Jeannette Lycan's own deposition testimony eviscerates the Plaintiffs' attorney malpractice and breach of contract claims even more significantly than Maddox's. Jeannette Lycan explained that she knew Maddox represented Prime Corporation.

Q: When you first gave the $2,000 you hadn't met Mark Maddox; is that correct?

A: No. I can't tell you. I don't think I had.

Q: Had you met Doug Brown?

A: No, we hadn't because we met at Denny's restaurant that time, but I can't remember the first—

Q: At that point you knew that Brown and Maddox were acting as counsel for Prime Corporation?

A: Gary told us that they had a very capable fellow because he was in securities before and he was a lawyer and we were lucky that we found him, that he found him.

Q: When you say they had a very capable attorney, who is "they"?

A: Well, Prime.

Q: Prime?

A: (Affirmative nod).

Q: Prime had a very capable attorney and that was Mark Maddox?

A: Right.

Jeannette Lycan Dep., p. 82–83. At various places in her deposition, Jeannette Lycan suggests that she assumed Maddox would represent her interests. However, she also noted that Maddox had never told her he would represent her in an individual capacity. She discussed various meetings she had with Maddox:

A: And my husband and I had met with him personally a couple different times and if he was not our attorney he would—he would have certainly told us so.

Q: So it is your statement then that Mr. Maddox had a duty to tell you he wasn't your attorney"

A: Well, he wouldn't have—if he wasn't he wouldn't have helped the proceedings.

Q: When you met with Mr. Maddox, did you meet with respect to individual matters, things that affected you and only you?

A: Well, we were in a group and I—and when the money was in there, I assumed, yes, it was my money that he was protecting.

Q: You assumed that.

A: Well—

Q: Did he ever tell you—

A: He was.

Q: Did he ever tell you "I'm representing you, Jeannette, in an individual capacity"?

A: I didn't come out and point blank ask him "are you whatever", but when he accepted us into his office and said he was the attorney—

Q: He said "I'm the attorney: or did he say "I'm the attorney for Prime"?

A: Well, he was attorney for all of us that was investors in Prime.

Jeannette Lycan Aff., p. 159–60. Maddox stated in his deposition that in every meeting he had with the Lycans, he told them he was not their attorney and advised them to seek independent counsel since he only represent-

ed the Corporation's interests. Aside from indirectly stating that Maddox "would have certainly told us" if he were not their attorney, Jeannette Lycan does not refute Maddox's deposition testimony. However, when Jeannette Lycan was first introduced to Maddox, Walters specifically informed her that Maddox was the attorney for Prime Corporation:

A: We were told by Gary that he was in securities and he was a very capable attorney.

Q: And who did Gary say Mark Maddox represented?

A: He said the Indiana securities was what he was before in this and we were really fortunate to get him.

Q: Who was really fortunate to get him, Prime Corporation?

A: Prime.

Q: Okay. Did Gary when he introduced you to Mark Maddox tell you that Mark Maddox represented Prime Corporation?

A: Uh-huh.

Q: Okay. Did Gary at that point tell you that he represented you personally, that Mark Maddox represented you personally?

A: No, just that he would take—he was secure that, you know, that he would take care of our interest.

Q: Who said that?

A: Or money. Gary.

Q: Gary said that?

A: Uh-huh.

Q: Did Mark Maddox say that he would take care of your interest?

A: Well, I assume he did when he had the job.

Q: You assumed.

A: Well, I—he—he did. He was hired as a Prime lawyer and he did.

Q: He was hired as the Prime lawyer?

A. Right.

Jeannette Lycan Dep., p. 99–100. Jeannette Lycan stated in her deposition that she thought the loan transaction was "a sure thing" because "we had good lawyers behind us...." Jeannette Lycan Dep. p. 246. She also traces some of her money to Maddox/C & S:

Q: Did you pay Mr. Maddox?

A: Some of my checks went there, my money did.

Q: Did you write a check to Mr. Maddox?

A: I didn't personally, but it was money.

Jeannette Lycan Dep. p. 246.[21] Jeannette Lycan suggested that she "assumed" Maddox would represent her interests.

Q: Let me go back and ask my question again. You have said there is a lot of investors; correct?

A: (Affirmative nod).

Q: Did the investors without Mr. Walters, without Miss Brownsing, without Mr. Spangle, ever get together and say "We're going to hire an attorney"?

A: Well, there was no point; we had him [Maddox] and Mr. Brown. Why would you need another other than that at that time when the money was going in and with the securities?

Q: So in other words—

A: We had confidence in him. Why would we need anybody else?

Jeannette Lycan Dep., p. 167. Despite this "assumption," the deposition testimony of Jeannette Lycan and Maddox shows that no attorney-client relationship arose in this case. Lycan was told who Maddox represented. She learned in her first meeting with Maddox that he was the attorney for Prime Cor-

---

**21.** This passage of funds bears little legal significance in this case. First, Jeannette Lycan does not contend she paid Maddox/C & S herself but only that money from her was used by Prime Corporation to pay Maddox/C & S. Second, persuasive authority establishes that the payment of legal fees does not in and of itself create an attorney/client relationship. *See, e.g., United States v. Costanzo,* 625 F.2d 465, 468 (3rd Cir. 1980) ("The attorney-client relationship is not dependent on the payment of a fee...."); *International Paper Co. v. Lloyd Mfg. Co., Inc.,* 555 F.Supp. 125, 132 (N.D.Ill.1982) ("What determines whether an attorney-client relationship exists has nothing to do with the payment of legal fees."). The focus of this Court's inquiry is on the issue of reliance—not the question of whether the Plaintiffs' money passed, directly or indirectly, to Maddox/C & S.

poration. Maddox stated that he told the Lycans at every meeting with them that he was not their attorney; the Plaintiffs do not respond to this. Maddox stated that he told them to get their own attorney; the Plaintiffs do not respond to this. Maddox stated that he never gave the Lycans legal advice; the Plaintiffs do not respond to this.

Despite Jeannette Lycan's own deposition testimony, the Plaintiffs continue to assert that they thought Maddox would "look out for" their interests. One brief asserts: "Plaintiffs had a reasonable expectation that [Maddox/C & S] as special securities counsel had done the required due diligence, and that it was safe for Plaintiffs to part with their monies." Pls. Statement of Gen.Iss.Opp. the Mots. of Maddox/C & S for Summ.J., p. 4 (hereinafter "Pls. Statement (Maddox/C & S)"). The same brief states that Maddox/C & S "by handling 'the proceedings' for Prime Corporation, as *special* securities counsel, conversed in person directly with the Lycans, and drafted the documents for them to sign thereby sending a strong signal that [Maddox/C & S] were looking out for Plaintiffs." Pls. Statement (Maddox/C & S), pp. 4–5.

What remains unclear, however, is *who* reasonably relied upon Maddox's words or deeds and assumed an attorney-client relationship had been created. Jeannette Lycan stated directly in her deposition that she knew Maddox represented Prime Corporation. That knowledge undermines her claim that she in fact relied upon Maddox as her attorney; more importantly, it shows that any reliance she placed in Maddox could not have been reasonable.

None of the other plaintiffs suggest that they believed an attorney-client relationship had been formed with Maddox either. Gray's affidavit does not assert that he believed Maddox was his attorney; nor does this affidavit state that he relied upon Maddox at any time. No evidentiary materials have been submitted suggesting that Millard Pauley believed Maddox was his attorney or that he relied upon Maddox. While Steve Lycan is not a plaintiff in this matter, his affidavit has been submitted in support of the Plaintiffs' cause. However, not even that affidavit establishes that anyone "reasonably relied" upon Maddox.

In the absence of reasonable reliance by any of the Plaintiffs, it cannot be said that Maddox "effectively consented" to an attorney-client relationship with any of the Plaintiffs. Without consent of both parties, *Hacker* holds that no attorney-client relationship will be implied. Therefore, this Court concludes as a matter of law that the Plaintiffs have not shown any genuine issue of material fact with respect to whether Maddox committed attorney negligence or whether Maddox breached a contract with them by failing to provide effective representation. Accordingly, summary judgment is granted in favor of Maddox/C & S on Count IV of the Plaintiffs' Complaint.

### 3. VIOLATIONS OF § 10(b) OF THE SECURITIES ACT OF 1934 AND RULE 10b–5

As with the claims against Brown/S & I, Plaintiffs initially contended that Maddox/C & S had "substantially assisted" other defendants in violating § 10(b) and Rule 10b–5. Since the Supreme Court eliminated aiding and abetting liability under these provisions in *Central Bank*, —— U.S. at ——, 114 S.Ct. at 1455, the Plaintiffs have attempted to revise their theory of the case to show that Maddox/C & S committed a primary violation of the Act and the Rule. This revision fails to indicate a genuine issue of material fact; therefore, summary judgment in favor of Maddox/C & S is appropriate on this count.

The necessary elements for § 10(b) and 10b–5 claims have been listed in the section discussing the Rally Defendants. Like the § 10(b) and 10b–5 claims against Brown, the claims against Maddox are appropriate for summary resolution since the Plaintiffs have not shown any genuine issues of material fact concerning whether Maddox made any material misrepresentations or omissions to them or concerning whether they relied upon Maddox in any way. The Plaintiffs have not identified any statement by Maddox which would support a misrepresentation claim. All the statements Plaintiffs attribute to Maddox relate to issues they wanted to see addressed in the various docu-

ments surrounding the loan transaction, such as the credit addendum. In every case identified by the Plaintiffs, Maddox agreed to include the requested materials in the documents. Disregarding the question of whether such a promise could constitute an actionable misrepresentation, he Plaintiffs have not shown any instance where Maddox failed to include a provision he stated he would include. Plaintiffs have not identified any of these statements as "misrepresentations" and have not pointed to any other statements by Maddox/C & S which could satisfy this element.

Like the claims against Brown/S & I, the Plaintiffs' claims against Maddox/C & S seem grounded in alleged omissions. The Plaintiffs assert that Maddox should have informed them that they were building a house on a less than firm foundation. However, this theory stands on shaky soil as well. Supreme Court and Seventh Circuit precedent clearly establish that mere silence does not violate § 10(b) or Rule 10b–5 unless there exists some duty to speak. *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1118. Maddox's failure to "blow the whistle" in this case will not subject him to liability under the rule or the statute unless he owed the Plaintiffs some type of obligation.

As a matter of law, no such obligation existed here. The Plaintiffs failed to designate any evidence suggesting that Maddox "effectively consented" to an attorney-client relationship by allowing them to rely upon him. Absent such a relationship, there is no fiduciary duty between Maddox and these Plaintiffs, and he had no responsibility to reveal any information to them.

■ Also, as noted in the previous section, the Plaintiffs have failed to provide any evidence that they relied upon Maddox for such information. Jeannette Lycan stated that she knew Maddox was the attorney for Prime Corporation. No evidence from Gray or Millard Pauley suggests they relied upon Maddox, either. Even if misrepresentations are made, a plaintiff who did not rely upon them cannot show he was harmed by them. *Latigo Ventures,* 876 F.2d at 1326. Because the Plaintiffs have failed to show reliance, their securities fraud claims lack a crucial

support and summary resolution of this claim is appropriate. For these reasons, summary judgment is granted in favor of Maddox/C & S on Count II of the Plaintiffs' Complaint.

## CONCLUSION

A party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists. With the exception of the § 12(1) claim against the Rally Defendants, the moving Defendants have met this burden on every claim raised against them by the Plaintiffs. Once the moving party has met its burden, the non-moving party must present specific facts showing that a genuine issue exists. With the exception of the § 12(1) claim against the Rally Defendants, the Plaintiffs have not provided such specific facts. Some of the theories postulated by the Plaintiffs in their briefs might have supported their claims, but these theories lacked the crucial evidentiary support. The exhibits and affidavits offered by the Plaintiffs simply failed to establish any genuine issue on several crucial elements of the Plaintiffs' case. As a result, summary resolution is not simply allowed; it is mandatory.

For the reasons stated above, this Court GRANTS the motion of the Rally Defendants with respect to Count II, Count V, and the portions of Count I dealing with fraudulent inducement to invest and with § 12(2) of the Securities Act of 1933; however, this Court DENIES the motion on the issue of whether any of the Rally Defendants violated § 12(1) of the Securities Act of 1933. This Court GRANTS the motions Defendants Brown/S & I and Defendants Maddox/C & S in their entirety and DENIES the motion of Plaintiffs Jeannette Lycan, David Pauley, and Gray Farms in its entirety.

IT IS SO ORDERED.